**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| LISA WALTERS, et al., | ) | |
|     Plaintiffs, | ) | |
| vs. | ) | |
| BRIAN KEMP, et al., | ) | |
|     Defendants. | ) | Case No. _____ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING
ORDER, AND/OR, IN THE ALTERNATIVE, ISSUANCE OF A
PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

Plaintiff Lisa Walters, a law-abiding member of her community, and similarly situated individuals have a fundamental, constitutionally guaranteed right to carry loaded, operable handguns on their person, in public, and outside the limited confines of their homes, cars, and workplaces for self-defense. But because of Defendants' laws, orders, and enforcement of them, they cannot exercise that right.

The State of Georgia's statutory scheme flips the exercise of rights and the presumption of liberty on their head. Rather than allowing people to exercise their right unless they are prohibited from possessing firearms and punishing specifically dangerous conduct, the State and its law enforcers take the opposite approach: they ban most all law-abiding citizens from carrying handguns in public on pain of criminal liability, and then provide a few narrow, limited exceptions—including the

2

possession of a valid GWL, which Plaintiff Walters cannot today acquire because of Defendants Wood and Cherokee County.

For Plaintiff Walters and others like her, the State's regulatory scheme and enforcement of the ban statutes have "effectively eliminate[d] the ability to bear arms outside the home." *Georgiacarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1321 (11th Cir. 2015). "If the fundamental right of self-defense does not protect" Plaintiff Walters and others like her, who wish to carry a handgun in public defense of themselves and their families during these times of societal challenge and unrest, "then the safety of all Americans is left to the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1033 (2016) (Alito, J., concurring).

## II.    STATEMENT OF FACTS

In Georgia, the average law-abiding citizen is completely prevented from carrying a loaded, operable handgun outside his or her home, personal vehicle, or workplace for self-defense purposes without a special GWL license issued by the probate court in the person's county of residence. O.C.G.A §§ 16-11-125.1(5), 16-11-126(h)(1) & (h)(2). On information and belief, this law is routinely enforced, including against people like Plaintiff Walters and others like her.

While Georgia broadly restricts the rights of ordinary, law-abiding citizens, it exempts sixteen categories of government favored individuals from "Code Sections

16-11-126 through 16-11-127.2," O.C.G.A § 16-11-130(a), even including many people who do not occupy any type of law enforcement role or duties in society, like "[c]lerks of the superior courts," § 16-11-130(a)(15). These sixteen categories of people can freely exercise the right to bear arms without risk of arrest or prosecution, without submitting any application, without paying any fees, without first passing a background check, and without having need for any license at all. The Legislature has provided no findings or declarations, and demonstrated no legitimate governmental interest, to support carving out a special exemption for such individuals. Except in courthouses, these exempt categories not only enjoy immunity from prosecution for violations of O.C.G.A. §§ 16-11-126 through 16-11-127.2, they are able to freely exercise their rights—without prior restraint, such as Plaintiff Walters and others like her must endure.

Plaintiff Walters, Plaintiffs SAF and FPC's similarly situated adult members, and others similarly situated to them—i.e., adults who are not prohibited from possessing and purchasing firearms and ammunition—have a fundamental, constitutionally guaranteed right and must be allowed to carry loaded, operable handguns on their person outside their homes, in public, for self-defense. And Plaintiff Walters would do so but for the reasonable and imminent fear and risk of arrest and criminal prosecution under the State of Georgia's laws and enforcement policies, orders, practices, and customs.

On or around March 14, 2020, Defendant Judge Wood of the Cherokee County Probate Court issued a "Notice to the Public" suspending all processing of carry license applications for two months, through at least May 13, 2020 ("CPO"). *See* https://www.cherokeega.com/Probate-Court. Defendants Wood's and Cherokee County's CPO persists to this day, declaring on their public-facing website that the processing of carry licenses is a "NON-ESSENTIAL" matter, and that such applications "WILL NOT be accepted during the period covered by the judicial emergency." *Id.* However, Defendants Wood's and Cherokee County's CPO expressly allows for the continued acceptance and processing of marriage license applications. On information and belief, Defendants Wood and Cherokee County are accordingly accepting and processing new marriage licenses for those exercising their right to marry, while refusing to accept and process GWL applications.

Plaintiff Walters is not prohibited from possessing or acquiring arms, including firearms and ammunition, under state or federal law. *See* Decl. of Lisa Walters ("L. Walters Decl." ¶ 5). Indeed, Plaintiff Walters at one time held a valid carry license issued by Cherokee County, but that license expired and cannot be renewed under Georgia's carry license statutory scheme. Plaintiff Walters meets all the qualifications to obtain a new carry license for this purpose and would be entitled to one upon submission of the required application and fees. (L. Walters Decl. ¶ 14.) Plaintiff Walters is concerned about her safety and the safety of her family,

2

particularly in light of the current public health crisis and the associated psychological and economic pressures increasing the potential of societal dangers as people face a scarcity of resources. (L. Walters Decl. ¶ 20.) On or about April 9, 2020, Plaintiff Walters, through her husband, contacted the department of Defendant Wood by telephone and inquired about the CPO in an effort to obtain the GWL carry license necessary to exercise these self-defense rights. *See* Decl. of Mark Walters ("M. Walters Decl.") ¶ 8.). Defendants informed Mr. Walters that they must and would continue to enforce the CPO of Defendants Cherokee County and Judge Wood, and thus would not accept or process her application for a carry license until further notice. (*Id.* at ¶ 9.)

Plaintiff Walters can and would exercise her right to carry a loaded, operable handgun in public for self-defense purposes, but for the reasonable and imminent fear and risk of arrest and criminal prosecution under the State of Georgia's laws, policies, orders, practices, customs, and enforcement actions imposing criminal sanctions for doing so without the license that the CPO prevents her from acquiring. (L. Walters Decl. ¶ 22.) Plaintiff Walters and her husband are members of Plaintiffs SAF and FPC. *See* L. Walters Decl. ¶¶ 3-4; M. Walters Decl. ¶¶ 3-4.

In addition to Plaintiff Walters, Plaintiffs SAF and FPC are themselves damaged by the Defendants law and practices, which caused and continue to cause them to divert and expend resources. And beyond their own direct damages, these

institutional plaintiffs have members and supporters who are affected by Defendants' laws and enforcement policies, practices, and customs. *See* Decl. of Alan Gottlieb ("Gottlieb Decl.") ¶ 11; Decl. of Brandon Combs ("Combs Decl.") ¶ 20. All Plaintiffs accordingly seek this necessary relief.

## III.   ARGUMENT

### A.   STANDARDS FOR ISSUING A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

"The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. v. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). The standards for granting such relief require the moving party show that: "(1) it has a substantial likelihood of success on the merits; [¶] (2) irreparable injury will be suffered unless the injunction issues; [¶] (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and [¶] (4) if issued, the injunction would not be adverse to the public interest." *Id.* at 1231. "A likelihood of success on the merits is generally considered the most important factor when considering whether to grant a preliminary injunction motion." *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1349 (N.D. Ga. 2016). "The evidence presented for each of those criteria is balanced by the court on a sliding scale analysis: a much stronger showing on one or more of the necessary factors lessens the amount of proof required for the

remaining factors." *Georgia Gazette Pub. Co. v. U.S. Dept. of Defense*, 562 F.Supp. 1004, 1008 (S.D. Ga. 1983).

## B.    PLAINTIFFS WILL SUCCEED ON THE MERITS.

Plaintiffs will succeed on the merits of their claims, because the Defendants' laws and enforcement policies, practices, and customs completely prohibit law-abiding adults—like Plaintiff Walters—from exercising their right to bear loaded, operable handguns for self-defense outside the home and in public generally. This total ban violates fundamental rights guaranteed by the Second and Fourteenth Amendments. The Defendants' laws, and their enforcement of them, are categorically unconstitutional and must be enjoined as such. For the same reason, this total ban would flatly fail any form of heightened scrutiny. Plaintiffs demonstrate a strong likelihood of success—the only possible outcome under the controlling law absolutely prohibiting such bans—as well a clear case of irreparable injury in the absence of immediate injunctive relief.

### (1)    Defendants' Orders and Enforcement Actions Deny Access To, Exercise Of, and Infringe Fundamental, Individual Rights, Rendering Them Categorically Unconstitutional.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., Amend. II. The Second Amendment is fully applicable to the States through the Fourteenth

Amendment's Due Process and Privileges or Immunities Clauses. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *Id.* at 805 (Thomas, J., concurring).

When the Second Amendment was ratified, "Americans understood the 'right of self-preservation' as permitting a citizen to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *District of Columbia v. Heller*, 554 U.S. 570 (2008) at 595 (quoting 1 Blackstone's Commentaries 145–46, n.42 (1803)) (brackets omitted). A global pandemic epitomizes a setting in which waiting for "the intervention of society" on one's behalf may be too late. And the right to self-defense with handguns extends beyond the limited confines of one's home, car, and workplace.

"We look to [the historical background of the Second Amendment] because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Heller*, 554 U.S. at 592 (italics original). To be sure, Georgia's regulatory scheme is not longstanding and has no historical pedigree supporting its constitutionality. *See generally* Decl. of George Mocsary ("Mocsary Decl.") at ¶¶ 19-20. And especially in the absence of historical precedence, the State's laws, and enforcement of them is constitutionally untenable. Returning to Georgia's own history, "No case, historic or recent, is discussed more prominently

or positively in *Heller* than the Georgia Supreme Court's 1846 decision in *Nunn v. State*." Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 AM. U. L. REV. 585, 627 (2012).[1] In *Nunn*, the Georgia Supreme Court considered the effects of a regulatory scheme similar to the one at issue here. In so doing, they were "of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms. *But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void ...*" *Nunn*, 1 Ga. 243 (1846) at 251 (italics added).

Through their laws and orders, and enforcement policies, practices, and customs, Defendants are violating the fundamental, constitutionally guaranteed rights of Plaintiff Walters and others like her—individuals who are otherwise entirely eligible to acquire and possess firearms under all applicable federal and state laws—and are applying a prior restraint against the right to effective, armed self-

---

[1] *See also Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019): "Critically, we must afford *Nunn's* understanding of the Second Amendment a good deal of weight, because, as *Heller* explains, [i]ts opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause.") *Young* at 1056 (quoting 554 U.S. at 612).

defense in public by banning the wearing, bearing, and carrying of loaded, operable handguns "upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125 at 143 (dissenting opinion of Ginsburg, J.) (quoting *Black's Law Dictionary* 214 (6th ed.1998)).

"The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. Dist. of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Courts are "not permitted to recognize a hierarchy among ... constitutional rights." *Id.* (quoting *Caplin & Drysdale, Chtd. v. United States*, 491 U.S. 617, 628 (1989)) (internal quotations omitted). The Second Amendment is not a "second-class right." *McDonald*, 561 U.S. at 780–81; *see also Ezell v. City of Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law"). Of particular significance here in light of Defendants' actions targeting handguns, the high court and the Eleventh Circuit have  recognized the handgun as "the quintessential self-defense weapon" in America, *Heller*, 554 U.S. at 629, and that "citizens must be permitted to use handguns for the core lawful purpose of self-defense," *McDonald,* 561 U.S. at 767–68; *GeorgiaCarry.org, Inc.*, 788 F.3d at 1322 (quoting *McDonald*).

2

Categorical bans like the one at issue here—which deny Plaintiffs the right to carry in their person loaded, operable handguns for self-defense outside their homes—are absolutely unconstitutional.

In *Heller*, which similarly involved an absolute prohibition on handguns, the Court demonstrated that the appropriate test to be applied is a categorical one; first looking to the text of the Constitution itself, and then looking to history and tradition to inform the scope and meaning of that text. *Heller* applied no tiered scrutiny analysis, considered no social science evidence, included no data or studies about the costs or benefits of the ban, and expressly rejected the intermediate scrutiny–like balancing test proposed by Justice Breyer's dissent. After all, the Court explained, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634. Rather, "[t]he Second Amendment . . . is the very product of an interest balancing by the people." *Id.* at 635.

In *McDonald*, the Supreme Court again held a handgun ban categorically invalid. And the Court again refused to adopt an interest-balancing approach to the ban: "Municipal respondents assert that, although most state constitutions protect firearms rights, state courts have held that these rights are subject to 'interest-balancing' and have sustained a variety of restrictions. In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right

should be determined by judicial interest balancing." *McDonald*, 561 U.S. at 785. As the Seventh Circuit has recognized, "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right . . . are categorically unconstitutional." *Ezell*, 651 F.3d at 703. Thus, when confronted with a complete prohibition on bearing arms similar to the one here, the Seventh Circuit held the prohibition categorically invalid because it destroyed the right to self-defense outside the home. *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). The *Moore* court dismissed the idea of a heightened scrutiny analysis for such a severe ban. *Id.* at 941 ("Our analysis is not based on degrees of scrutiny").

The D.C. Circuit struck down a requirement that applicants demonstrate a "good reason" for a handgun carry permit. *Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017). The *Wrenn* court "trace[d] the boundaries laid in 1791 and flagged in *Heller*," and concluded "that the law-abiding citizen's right to bear common arms must enable the typical citizen to carry a gun." *Id.* at 668.

Moreover, the Eleventh Circuit expressly recognized the Supreme Court's clear directive "that 'individual self-defense is the *central component* of the Second Amendment right,' and that 'citizens must be permitted to use handguns for the core lawful purpose of self-defense.'" *GeorgiaCarry.org, Inc.*, 788 F.3d at 1323 (quoting *McDonald*, 561 U.S. at 767–68 (italics original). Thus, while the Eleventh Circuit upheld the firearms restriction at issue in *GeorgiaCarry.org*, the court took pains to

2

explain how far apart it was from the handgun restriction in *Heller*—and, thus, the broad ban applied to Plaintiff Walters and those like her in this case—emphasizing "[t]he plaintiffs can freely exercise their right to bear arms for self-defense elsewhere, whether in the home or on the streets, without running afoul of this regulation," because it applied only on Army Corps of Engineers property. *Id.* at 1325–26. This distinction was central to the conclusion that the regulation "does not gut the plaintiffs' general right to keep and bear arms in self-defense." *Id*. at 1326.

And just as "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed," *Heller*, 554 U.S. at 629, it is no answer to say that the carrying of handguns can be banned so long as the carrying of long guns is allowed. Handguns are "the quintessential self-defense weapon," *id.* at 629, "that [are] overwhelmingly chosen by American society for that lawful purpose [of self-defense]," *id.* at 628. There are many reasons that a citizen may prefer a handgun for self-defense; for example, they are conveniently carried on the person, "readily accessible in an emergency," and "cannot easily be redirected or wrestled away by an attacker." *Id.*

Additionally, "it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a[n] [attacker] with one hand while the other hand dials the police." *Heller*, 554 U.S. at 628. "Whatever the reason,

handguns are the most popular weapon chosen by Americans for self-defense[], and a complete prohibition of their use is invalid." *Id*.

The State's handgun ban outside the home "amounts to a prohibition" on the use of "an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Heller*, 554 U.S. 570 at 628. And the net effect of the challenged laws and enforcement policies, practices, and customs is a categorical prior restraint against and ban on the fundamental, individual right to carry on the person loaded, operable handguns for self-defense in public outside the home—a policy judgment that Defendants simply cannot make. *Heller*, 554 U.S. at 634 ("The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."). Such a regulatory scheme is categorically unconstitutional, full stop.

**(2)    The Carry Ban Imposed on Plaintiff Walters and Others Like Her Cannot Survive Any Level of Heightened Scrutiny.**

Assuming *arguendo* an interest-balancing test must be applied, the challenged statutes and Defendants' orders and actions also fail the Eleventh Circuit's two-part test applying tiered scrutiny. Generally, the Eleventh Circuit applies a two-part test for Second Amendment challenges. "In analyzing a Second Amendment claim, this Court has followed a two-step analysis: first, we ask if the restricted activity is

protected by the Second Amendment in the first place; and then, if necessary, we ... apply the appropriate level of scrutiny." *Georgiacarry.org, Inc.*, 788 F.3d at 1322.

Most fundamentally, the high court in *Heller* declared that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family, would fail constitutional muster." 554 U.S. at 628–29. And because "possession and carrying—keeping and bearing—are on equal footing," *Wrenn*, 864 F.3d at 666, a ban on bearing handguns outside the home in public also fails under any standard of scrutiny.

The *Heller* Court further declared that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family, would fail constitutional muster." 554 U.S. at 628–29. And because "possession and carrying—keeping and bearing—are on equal footing," *Wrenn*, 864 F.3d at 666, a ban on bearing handguns outside the limited confines of one's home, car, and place of work also fails under any standard of scrutiny.

As discussed above, the challenged laws and Defendants' enforcement thereof strike at the very core of the Second Amendment, thereby satisfying the first step of the two-part test. *Wrenn*, 864 F.3d at 661 ("the individual right to carry common firearms beyond the home for self-defense—even in densely populated areas, even

for those lacking special self-defense needs—falls within the core of the Second Amendment's protections."); *see also United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017) (quoting *Heller*, 554 U.S. at 592 (the Second Amendment "codified a pre-existing 'individual right to possess and carry weapons in case of confrontation'"). This calculus does not change in an emergency, declared or otherwise. In *Bateman v. Purdue*, 881 F.Supp.2d 709 (E.D.N.C. 2012), for example, the district court evaluated state statutes that authorized various governmental restrictions on the possession, transportation, sale, and purchase of "dangerous weapons" during declared states of emergency. *Id.* at 710–11. The district court evaluated the statutes under a two-part test, and found first that "[i]t cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment." *Id.* at 713–14.

Because of their nature and breadth, Defendants' laws and enforcement should be evaluated under strict scrutiny, which requires that they be narrowly tailored to achieve a compelling state interest and that no less restrictive alternative exists to achieve the same ends. *Georgia State Conference of NAACP v. Fayette County Bd. of Com'rs*, 996 F.Supp.2d 1353, 1365 (N.D. Ga. 2014) (citing *Bush v. Vera*, 517 U.S. 952, 976 (1996). Given the scope and effect of Defendants' laws and enforcement policies, completing destroying the right of law-abiding people like Plaintiff Walters to bear operable handguns outside their home and vehicles during

this pandemic, they cannot survive strict scrutiny. At issue here is the very sort of categorical ban that can never be tolerated under *Heller* and *McDonald*.

Even under intermediate scrutiny, the same result must follow. Under intermediate scrutiny review, the government bears the burden of demonstrating a reasonable fit between the challenged regulation or law and a substantial governmental objective that the law ostensibly advances. *GeorgiaCarry.org, Inc.*, 788 F.3d at 1328 (quoting *Heller*, 670 F.3d at 1258 ("intermediate scrutiny in the Second Amendment context … ask[s] whether the government regulation is 'substantially related to an important governmental objective'"); *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480–81 (1989). The Eleventh Circuit itself has recognized that "any constitutional elevated scrutiny analysis— strict or intermediate—would require us to consider the fit between the challenged regulation and its purpose." *GeorgiaCarry.org, Inc.* at 1328 (italics original).

To carry this burden, the government must present "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Turner Broad. Sys., Inc.*, 520 U.S. 180, 195 (1997). And in the related First Amendment context, the government is typically put to the evidentiary test to show that the harms it recites are not only real, but "that [the speech] restriction will in fact alleviate them to a material degree." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1177 (9th Cir. 2018) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United*

2

*States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993)). This same evidentiary burden should apply with equal force to Second Amendment cases, where equally fundamental rights are at stake. S*ee Ezell,* 651 F.3d at 706–07 (citing *Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 561 U.S. at 782) ("Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context"); *see* also *U.S. v. Marzzarella*, 614 F.3d 85, 89 n.4 (3rd Cir. 2010) ("[W]e look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice.").

In determining whether this burden has been carried, a court must ensure that "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). Thus, in the First Amendment context, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). For example, restrictions on commercial speech must "tailored in a reasonable manner to serve a substantial state interest." *Edenfield*, 507 U.S. at 770. The Supreme Court has made abundantly clear that "reasonable tailoring" requires a considerably closer fit than mere rational basis scrutiny, as the

restriction must directly and materially advance a bona fide state interest. *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 183 ("[The Court] must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.").

That the State allows *sixteen categories* of government-favored people, including superior court clerks, to freely exercise the right to bear arms without fear or risk of arrest and prosecution—without submitting any applications, paying any fees, even passing a background check, or having need for any license at all—shows a governmental interest that is inconsistently pursued. In light of those exemptions, the interest is not and cannot be a substantial one for constitutional purposes. And unlike those sixteen categories of individuals, Plaintiff Walters now cannot carry a handgun on her person for self-defense anywhere outside the confined space of outside her home, vehicle, or workplace. To be sure, the question is not whether an interest is important at the highest level of generality; rather, the fundamental concern is whether a government is genuinely applying rules about its interest in a consistent manner such that it demonstrates the importance of the interest. Like the regulatory regime that failed constitutional muster in *Greater New Orleans Broad. Ass'n, Inc.,* Defendants' laws and enforcement practices here—the State of Georgia's sixteen categorical exemptions from the general ban and GWL requirement, and Defendants Wood and Cherokee County's accepting and

2

processing marriage licenses—are "so pierced by exemptions and inconsistencies that [they] cannot hope to exonerate [them]." *Id.* at 190.

In the Second Amendment context, even Justice Breyer's balancing test proposed in his *Heller* dissent (and expressly rejected by the majority) considered "reasonable, but less restrictive, alternatives." 554 U.S. at 710 (Breyer, J., dissenting). Many circuit courts recognize this obligation in the Second Amendment context. *Heller v. District of Columbia*, 801 F.3d 264, 277–78 (D.C. Cir. 2015) ("Heller III"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 124 n.28 (3d Cir. 2018); *Ezell*, 651 F.3d at 709; *Moore v. Madigan*, 702 F.3d at 940; *United States v. Reese*, 627 F.3d 792, 803 (10th Cir. 2010); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1128 (10th Cir. 2015). Ultimately, "'[t]he government must bear the burden of justifying its restriction on constitutional rights, and that 'burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree.'" *Borgner v. Brooks*, 284 F.3d 1204, 1211 (11th Cir. 2002) (quoting *Rubin v. Coors Brewing Co*., 514 U.S. 476, 487 (1995)).

Here, the challenged laws, orders, enforcement actions entirely cut off the right of law-abiding individuals—like Plaintiff Walters and others not prohibited

from possessing and acquiring arms—to bear handguns outside the home, in public, for self-defense and lawful purposes. There necessarily can be no "reasonable fit" nor a "proportional fit" with the stated objective of abating the spread of COVID-19 because the effect is an outright and total ban against these individuals' right to carry a handgun in public for self-defense. There cannot even be any question about "reasonable tailoring," *Greater New Orleans Broad. Ass'n, Inc.,* 527 U.S. at 183, because there is no tailoring at all. Every one of these people is completely barred from lawfully exercising this self-defense right *anywhere* in the State of Georgia.

And, Defendants Wood and Cherokee County cannot even hope to show, without "mere speculation or conjecture," that their "'restrictions will in fact alleviate … to a *material* degree'" the problems they claim to be addressing. *Borgner v. Brooks*, 284 F.3d at 1211 (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. at 487) (italics added). There is simply no reason to believe that the standard forms of infectious disease prevention protocols in accepting and processing GWL applications would be any less effective than in any of the other numerous government licensing processes still continuing around the country today. Quite tellingly, these include the accepting and processing of marriage licenses at the Cherokee County Probate Court; if those can continue with the standard safety protocols in place, the GWL application process can too. Defendants would be hard pressed to claim—much less prove—otherwise. Under well-settled United States

Supreme Court jurisprudence—fully recognized by the Eleventh Circuit—Defendants Wood's and Cherokee County's CPO and their enforcement of it, eliminating the GWL application processing program, woefully fail any constitutional scrutiny.

Plaintiffs have thus demonstrated both a strong likelihood of success on the merits—"the most important factor" in the preliminary injunction analysis—*Project Vote, Inc. v. Kemp*, 208 F.Supp.3d at 1349—because success is the only conceivable outcome under the controlling principles of constitutional law.

**C.    THIS DESTRUCTION OF CONSTITUTIONAL RIGHTS CONSTITUTES IRREPARABLE INJURY, AND THE BALANCE OF THE EQUITIES AND INTERESTS WEIGH HEAVILY IN FAVOR OF IMMEDIATE RELIEF TO AVOID FURTHER INJURY.**

Plaintiffs also strongly demonstrate the important factor of irreparable harm. The deprivation of constitutionally protected individual liberty, even temporarily, constitutes irreparable injury. *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 38 F.Supp.3d 1365, 1378-79 (N.D. Ga. 2014) (aff'd *GeorgiaCarry.org, Inc.*, 788 F.3d at 1329) ("The Court does not question that a demonstrated violation of certain constitutional rights satisfies the irreparable harm requirement without any further showing."); *Reed v. Long,* 420 F.Supp.3d 1365, 1378 (M.D. Ga. 2019) (quoting *Univ. Books & Videos, Inc. v. Metro. Dade Cty.*, 33 F. Supp.2d 1364, 1373 (S.D. Fla. 1999), which cited *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("'[t]he Supreme Court has held that any loss of First Amendment freedoms, even for a brief

amount of time, is sufficient to constitute the irreparable injury necessary to justify the issuance of a[n] injunction.'''"); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995).

Here, the injury is clear, palpable, and irreparable, and will continue to be so long that the State's carry ban scheme is imposed upon Plaintiff Walters and others like her, especially since they cannot acquire a GWL. Plaintiff Walters, similarly situated members and supporters of SAF and FPC, and other similarly situated members of the public, are left in reasonable fear, and in realistic risk of being charged and prosecuted for violating O.C.G.A. § 16-11-126. Indeed, each day that has passed so far has brought significant injury upon everyone who has been effectively precluded from exercising their right to secure the safety of themselves and their families carrying a handgun in public for self-defense. Again, without an existing GWL, all average citizens in Cherokee County otherwise entirely eligible for such a license are absolutely barred from lawfully exercising their fundamental rights given the effect of O.C.G.A. § 16-11-126(h)(2) which applies across the board to all Georgia residents and criminalizes the exercise of this right without a GWL.

Unquestionably, this has caused and is continuing to cause "irreparable harm." And to be sure, even if an injunction such as Plaintiffs request issues, the State would still have many ways to address specific conduct and crimes. *See, e.g.*, 18 U.S.C. § 922(g) (federal law banning possession by prohibited persons);

O.C.G.A. §§ 16-11-30 et seq. (prohibiting specific conduct); 16-11-120 et seq. (prohibiting possession of "dangerous weapons" unless specifically exempt); 16-11-127(b) (prohibiting carry in government buildings, etc.); 16-11-127.1 (prohibiting carry in school safety zones and at school functions); 16-11-127.2 (prohibiting possession in nuclear power facilities); 16-11-130.2 (prohibiting carry in restricted areas of commercial airports); 16-11-131 (prohibiting possession by prohibited persons); 16-11-134 (prohibiting discharge while under the influence).

Because Plaintiffs have made such a strong showing of a likelihood of success and irreparable harm in the absence of immediate injunctive relief, on the "sliding scale" of the preliminary injunction analysis, their burden is that much lighter to carry in demonstrating the final two factors—that the balance of equities and the public interests weigh in favor of granting such relief as well. *See Georgia Gazette Pub. Co. v. U.S. Dept. of Defense,* 562 F.Supp. at 1008. Plaintiffs readily demonstrate these factors as well. The foregoing analysis already starkly illustrates that both the equities and public interests heavily weigh in Plaintiffs' favor.

This is also obvious through Defendants Wood's and Cherokee County's own laws and practices with respect to marriage licenses. Defendants Wood and Cherokee County continue to process marriage applications in the face of the same risks that they claim necessitate closure of GWL application processing. Their willingness and ability to do so reveals the reality that they can and will implement

sufficiently adequate safety protocols for reducing the spread of COVID-19 in interfacing with the public for licensing processes during this time. Thus, they simply cannot stake claim in any equitable concerns or public interests related to the public health crisis that would justify or warrant their suspension of GWL applications. Their own operations prove they can adequately meet any and all such concerns in processing GWL applications. The only difference is that they have evidently made a policy choice to cut off access to one fundamental right while actively serving another—a choice that the Supreme Court has taken off the table.

## IV.   CONCLUSION

The "constitution [was] intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. State*, 17 U.S. 316, 415 (1819). For all the reasons discussed herein, Plaintiffs' Application for a Temporary Restraining Order, or in the Alternative, Motion for Preliminary Injunction should be granted, and they respectfully request this Court do so. (*See Georgia v. United States*, 398 F.Supp.3d at 1358.)

/s/ John R. Monroe
John R. Monroe
John Monroe Law, P.C.
156 Robert Jones Road
Dawsonville, GA  30534
678-362-7650
jrm@johnmonroelaw.com
State Bar No. 516193

2

_____ /s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705
*App. for Pro Hac Vice Forthcoming*


_____ /s/ Adam Kraut
Adam Kraut, Esq.
Firearms Policy Coalition
Attorney for Plaintiffs
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
akraut@fpclaw.org
*App. for Pro Hac Vice Forthcoming*

Attorneys for Plaintiffs


## **RULE 7.1 CERTIFICATE**

I certify that this brief was prepared with one of the font and point selections approved in Rule 5.1(B).


_____ /s/ John R. Monroe
John R. Monroe

2