## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| LISA WALTERS, an individual; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-01624-SCJ |
| BRIAN KEMP, in his official capacity as the Governor of Georgia; GARY VOWELL, in his official capacity as Commissioner of the Department of Public Safety and Colonel of the Georgia State Patrol; THE COUNTY OF CHEROKEE; and KEITH WOOD, in his official capacity as Judge of the Probate Court of Cherokee County, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF JUDGE KEITH WOOD

Judge Keith Wood, who appeared before the undersigned notary public duly

authorized to administer oaths in the State of Georgia, and after being sworn,

deposes and says as follows:

Defendants Cherokee County
and Judge Keith Wood

Exhibit 1

1.

I am over the age of 21 years, am under no legal disability which would prevent
me from giving this affidavit, and give this affidavit of my own personal
knowledge of the facts contained herein.

2.

I am named in my official capacity as Judge of the Probate Court of Cherokee
County, Georgia in the above-captioned civil action now pending in the United
States District Court for the Northern District of Georgia.

3.

I currently serve as Probate Judge of Cherokee County, having served in such
capacity since 2009.

4.

As Probate Judge of Cherokee County, I am responsible for the operations of all
functions of the Probate Court, including the management and supervision of my
staff.

5.

As Probate Judge of Cherokee County, I am not subject to the supervision and
control of Cherokee County in the management and operations of the Probate
Court.

6.

As Probate Judge of Cherokee County, I am responsible for the acceptance and review of applications for and the issuance of Georgia weapons carry permits ("GWLs") pursuant to O.C.G.A. §16-11-129.

7.

In order to process a new application for a GWL, it is necessary that the applicant be fingerprinted.  A "new" application would be one where the applicant has either never had a GWL or has allowed a prior GWL to have lapsed more than 30 days.

8.

The Probate Court of Cherokee County has a "live scan" fingerprinting machine which is located in the file room.

9.

The collection of a GWL applicant's fingerprint is performed by one of my employees in the Probate Court who are trained to perform such act. (I do not have a contract with any law enforcement agencies to collect fingerprints for GWL applications).

10.

In order to most effectively fingerprint someone, the person collecting the fingerprint is required to stand immediately next to the applicant, guide that

person's hands/fingers onto a glass plate, and roll each fingertip onto the glass plate.

11.

This fingerprinting process takes, on average, three minutes per applicant.

12.

Additionally, an applicant for both a new or renewal GWL is required to be photographed and to provide an electronic signature.

13.

A GWL applicants' photograph is likewise taken in the file room of the Probate Court and is performed by one of my employees in the Probate Court who are trained to perform such act.

14.

In order to properly photograph an applicant, the employee sits approximately 3-4 feet from the applicant and takes the photograph using a USB computer camera attached to a desktop computer.

15.

The GWL applicant cannot wear a mask when his/her photograph is taken.

16.

A GWL applicant must then provide a signature on an electronic keypad using a

common stylus available to all applicants.

17.

Finally, a GWL applicant must review the information entered into the system to

check for typographical errors and sign an acknowledgment that the information is

correct.

18.

The photograph/signature/review process takes, on average, five (5) minutes.

19.

The Probate Court facilities are relatively small and there is limited space available

for employees and visitors, such as applicants for GWL's and individuals

appearing in Probate Court for other purposes.

20.

As Probate Judge of Cherokee County, I am responsible for the acceptance and

review of applications for and issuance of marriage licenses pursuant to O.C.G.A.

§19-3-30.

21.

In order to obtain a marriage license, it is not necessary for applicants to be fingerprinted or photographed.

22.

In order to obtain a marriage license, an applicant must complete a written application and file the same, along with proper payment, in the Probate Court.

23

This procedure is completed with the applicant separated from the staff member by a thick glass partition and not standing within 3-4 feet of the staff member for any extended period of time.

24.

On March 14, 2020, I became aware that the Governor of the State of Georgia issued a State of Emergency in response to the public health crisis resulting from the COVID-19 pandemic (the "DOE").

25.

A true and correct copy of the DOE as I reviewed it and as appears on the Governors website (https://gov.georgia.gov/executive-action/executive-orders/2020-executive-orders) is attached hereto as Exhibit 1.

26.

On March 14, 2020, I became aware of the Declaration of State of Judicial

Emergency as issued by the Chief Justice of the Supreme Court of Georgia (the

"JEO").  A true and correct copy of the JEO as published on the website of the

Georgia Supreme Court (https://www.gasupreme.us/wp-

content/uploads/2020/03/CJ-Melton-amended-Statewide-Jud-Emergency-

order.pdf) is attached hereto as Exhibit 2.  A true and correct copy of the amended

JEO as published on the website of the Georgia Supreme Court

(https://www.gasupreme.us/wp-

content/uploads/2020/04/CJ_Melton_Extension_Order_signed_entered.pdf) is

attached hereto as Exhibit 3.

27.

In the JEO, the Chief Justice of the State of Georgia, directed as follows:

> To the extent feasible, courts should remain open to address essential functions, and in particular courts should give priority to matters necessary to protect health, safety, and liberty of individuals. Essential functions are subject to interpretation; however, some matters that fall into the essential function category are: (1) where an immediate liberty or safety concern is present requiring the attention of the court as soon as the court is available; (2) criminal court search warrants, arrest warrants, initial appearances, and bond reviews; (3) domestic abuse temporary protective orders and restraining orders; (4) juvenile court delinquency detention hearings and emergency removal matters; and (5) mental health commitment hearings.

28.

Acceptance and processing of GWLs was not identified as an "essential function" in the JEO.

29.

On March 16, 2020, I received from the Judicial Qualifications Commission (the "JQC") a statement informing me that any judge who failed to follow the JEO could be subject disciplinary action before the JQC.   A true and correct copy of the statement from the JQC as I received it, and as appears on the JQC's website (https://img1.wsimg.com/blobby/go/d72953e9-9d0a-4693-87a4-cedcc5933b8d/downloads/JQC%20Statement%20on%20Statewide%20Judicial%20Emergency.pdf?ver=1587062736798)is attached hereto as Exhibit 4.

30.

On or about March 17, 2020, I received a memorandum (the "CPJ Memorandum") from the Executive Committee of the Council of Probate Judges of Georgia (the "Council").  A true and correct copy of the CPJ Memorandum, as I received it, is attached hereto as Exhibit 5.

31.

Pursuant to the CPJ Memorandum, the Council expressed its position that weapons carry licenses are not essential services under the JEO.

32.

I further reviewed the COVID-19 Interim Guidelines for Businesses and

Employers issued by the Centers for Disease Control (the "CDC Guidelines") (a

true and correct copy of the CDC Guidelines as I reviewed them and as appear

available on the CDC's website (https://www.cdc.gov/coronavirus/2019-

ncov/community/guidance-business-response.html) are attached as Exhibit 6.

33.

On or about March 14, 2020, and in reliance upon my review of the guidance

provided to me by the JEO, as amended, the JQC Statement, the CPJ

Memorandum and the CDC Guidelines, I determined that I could not allow the

continued acceptance and processing of applications for GWL's while adequately

protecting the health and safety of my employees and visitors to the Probate Court.

34.

My specific concerns regarding the protection of the health and safety of my

employees and visitors to the Probate Court were based upon the following:

- limited space available in the Court which would not allow for proper

  social distancing;

- a lack of funds or resources to construct screens or other physical barriers

  which would serve to reduce the risk of spreading the coronavirus;

- the fact that personal protective equipment, i.e.: masks, gloves, etc., are only available in limited supply for Probate Court employees; and

- the inability to collect fingerprints and take photographs within the recommended social distancing between applicants and Probate Court staff.

35.

Accordingly, on March 14, 2020, I temporarily suspended the acceptance of GWL applications.

36.

On April 2, 2020, I became aware of the Governor's Executive Order imposing a mandatory shelter-in-place and establishing guidelines for "critical infrastructure" within the State of Georgia (the "SIP"). A true and correct copy of the SIP as I reviewed it and as appears on the Governor's website is attached hereto as Exhibit 7.

37.

Upon receipt and review of the Governors Executive Order, it became apparent to me that I could not achieve the guidelines for critical infrastructure employers as set forth in the SIP while accepting application s for GWLs given the size and layout of the Probate Court, the resources available to me and the procedure required to accept applications for GWLs.

38.

Accordingly, in order to protect the health and safety of my employees and visitors

to the Probate Court, and in reliance upon the DEO, the JEO, as amended, the JQC

Statement, the CPJ Memorandum, the CDC Guidelines and the SIP, and after April

2, 2020, I made the decision to continue to suspend the acceptance of applications

for GWLs until I can ensure the such permit could be accepted and processed in

full compliance with the guidelines and instructions set forth in the DEO, the JEO,

as amended, the JQC statement, the CDC Guidelines and the SIP.

39.

I declare, under penalty of perjury that the facts contained in this affidavit are true

and correct to the best of my knowledge.

Executed in Cherokee County, Georgia, this 24th day of April, 2020.

_____

Judge Keith Wood

Sworn to and subscribed
before me this **24** day of
April, 2020

_____
Notary Public
Commission Expires: Jan. 10, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed AFFIDAVIT OF JUDGE KEITH WOOD with the Clerk of Court using the CM/ECF system, which will automatically provide notice to all counsel of record:

I further certify that the above and foregoing meets the requirements set forth in L.R. 5.1(C) and has been prepared using Times New Roman 14-point font.

This 24th day of April, 2020.

**JARRARD & DAVIS, LLP**

/s/ *Patrick D. Jaugstetter*
ANGELA E. DAVIS
Georgia Bar No. 240126
adavis@jarrard-davis.com
PATRICK D. JAUGSTETTER
Georgia Bar No. 389680
patrickj@jarrard-davis.com
Attorneys for Defendant Keith Wood

222 Webb Street
Cumming, Georgia 30040
(678) 455-7150 (telephone)
(678) 455-7149 (facsimile)



# THE STATE OF GEORGIA

## EXECUTIVE ORDER

BY THE GOVERNOR:

### DECLARATION OF PUBLIC HEALTH STATE OF EMERGENCY

**WHEREAS:**    In late 2019, a new and significant outbreak of respiratory disease caused by a novel coronavirus emerged in Wuhan, China; and

**WHEREAS:**    The respiratory disease caused by the novel coronavirus, known as "COVID-19," is an infectious virus that can spread from person-to-person and can result in serious illness or death; and

**WHEREAS:**    On March 13, 2020, President Donald Trump declared the outbreak of COVID-19 a national emergency; and

**WHEREAS:**    The Centers for Disease Control and Prevention has identified the potential public health threat posed by COVID-19 both globally and in the United States, and has advised that the person-to-person spread of COVID-19 will continue to occur globally, including within the United States; and

**WHEREAS:**    The Centers for Disease Control and Prevention has noted that COVID-19 is proliferating via "community spread," meaning people have contracted the virus in areas of Georgia as a result of direct or indirect contact with infected persons, including some who are not sure how or where they became infected; and

**WHEREAS:**    Laboratory testing has confirmed more than sixty cases of COVID-19 in Georgia; and

**WHEREAS:**    In consultation with the Commissioner of Public Health, the Georgia Coronavirus Task Force, and other state health and emergency preparedness officials, I have determined a public health emergency exists, and that it is necessary and appropriate to take action to protect the health, safety, and welfare of Georgia's residents and visitors to ensure COVID-19 remains controlled throughout this State, as provided by Code Section 38-3-51; and

**WHEREAS:**    The uninterrupted supply of medical goods and other emergency related materials, supplies, goods, and services during this

Exhibit 1
Wood

emergency is an essential need of the public and any perceived or actual shortage threatens public welfare; and

**WHEREAS:** The Federal Motor Carrier Safety Regulations, 49 C.F.R. §§ 390 *et seq.*, prescribes limits on the hours of service for operators of commercial vehicles, and federal law, 23 U.S.C. § 127, sets forth certain weight limitations for vehicles on interstate highways; and

**WHEREAS:** 49 C.F.R. § 390.23 allows the Governor of a state to suspend these rules and regulations for commercial vehicles responding to an emergency for up to thirty (30) days, if the Governor determines an emergency condition exists.

**NOW, THEREFORE, PURSUANT TO CODE SECTION 38-3-51, AND THE AUTHORITY VESTED IN ME AS GOVERNOR OF THE STATE OF GEORGIA, IT IS HEREBY**

**ORDERED:** That a Public Health State of Emergency exists in the State of Georgia due to the public health emergency from the spread of COVID-19.

**IT IS FURTHER**

**ORDERED:** That all resources of the State of Georgia shall be made available to assist in activities designed to address this emergency, control the spread of COVID-19, and aid recovery efforts.

**IT IS FURTHER**

**ORDERED:** That the Georgia Emergency Management and Homeland Security Agency shall activate the Georgia Emergency Operations Plan (GEOP) in response to this emergency.

**IT IS FURTHER**

**ORDERED:** That the Georgia Department of Public Health, as the state agency responsible for emergency management services under *GEOP Emergency Support Function (ESF) 8 - Public Health and Medical Services*, shall coordinate with the Center for Disease Control and Prevention for release of the Strategic National Stockpile as necessary and appropriate in response to this Public Health State of Emergency.

**IT IS FURTHER**

**ORDERED:** That the Georgia Emergency Management and Homeland Security Agency is designated as the lead agency for responding to this public health emergency and shall coordinate all emergency response activities and other matters pertaining to this Public Health State of Emergency.

**IT IS FURTHER**

**ORDERED:** That acting pursuant to the Governor's authorization, the Georgia Department of Public Health shall coordinate with the Georgia Emergency Management and Homeland Security Agency to take any action necessary to protect the public's health, including, without limitation:

(1) Planning and executing public health emergency assessments, mitigation, preparedness response, and recovery for the state;

(2) Coordinating public health emergency responses between state and local authorities;

(3) Establishing protocols to control the spread of COVID-19;

(4) Coordinating recovery operations and mitigation initiatives;

(5) Collaborating with appropriate federal government authorities, elected officials of other states, private organizations, or private sector companies;

(6) Organizing public information activities regarding the state's public health emergency response operations, including educating the public on prevention of the spread of COVID-19 based on Centers for Disease Control and Prevention's guidelines and the best scientific evidence available;

(7) Providing special identification for public health personnel involved in this Public Health State of Emergency;

(8) For all persons meeting the Centers for Disease Control and Prevention's definition of a Person Under Investigation ("PUI"), implementing a program of active monitoring, which may include a risk assessment within twenty-four (24) hours of learning that the person meets the PUI criteria and twice-daily temperature checks for a period of at least fourteen (14) days or until the PUI tests negative for COVID-19; and

(9) Implementing quarantine, isolation, and other necessary public health interventions consistent with Code Sections 31-12-4 and 38-3-51(i)(2) or as otherwise authorized by law.

**IT IS FURTHER**

**ORDERED:** That all state and local authorities as well as public and private hospitals, healthcare facilities, clinics, and medical personnel shall fully comply with orders by the Governor as authorized by Georgia law, in furtherance of this Order.

**IT IS FURTHER**

**ORDERED:** The Georgia Composite Medical Board is authorized to grant temporary licenses to physicians who apply for a temporary medical license and are currently licensed as a physician in good standing by equivalent boards in other states to assist with the needs of this public health emergency.

**IT IS FURTHER**

**ORDERED:**     The Georgia Board of Nursing is authorized to grant temporary licenses to nurses who apply for a temporary license and are currently licensed in good standing as an Advanced Practice Registered Nurse, Licensed Practical Nurse, or Registered Professional Nurse by an equivalent board in another state to assist with the needs of this public health emergency.

**IT IS FURTHER**

**ORDERED:**     That in accordance with 49 C.F.R. 390.23(a)(1)(i)(A), the federal rules and regulations limiting hours operators of commercial vehicles may drive are suspended to ensure that carrier crews available as needed to provide emergency relief. This declared emergency justifies a suspension of Part 395 (driver's hours of service) of Title 49 of the Code of Federal Regulations. The suspension will remain in effect for thirty (30) days from the date of this Order or until the emergency condition ceases to exist, whichever is less.

**IT IS FURTHER**

**ORDERED:**     That no motor carrier operating under the terms of this emergency declaration will require or allow an ill or fatigued driver to operate a motor vehicle. A driver who notifies a motor vehicle carrier that he or she needs immediate rest will be given at least ten (10) consecutive hours off-duty before being required to return to service.

**IT IS FURTHER**

**ORDERED:**     That weight, height, and length for any such vehicle traveling through the State of Georgia for the purposes of providing disaster relief and/or preparation, which traverses roadways maintained by the State of Georgia, shall not exceed the following:

(1) A maximum gross vehicle weight for vehicles equipped with five (5) weight bearing axles, with an outer bridge span of not less than fifty-one (51) feet, shall not exceed a gross vehicle weight of ninety-five (95) thousand pounds, a maximum width of ten (10) feet and an overall length of one hundred (100) feet. Continuous travel is authorized, with the proper escorts.

(2) If the width of said vehicle exceeds eight (8) feet six (6) inches ad is traveling after daylight, defined as thirty (30) minutes before sunset to thirty (30) minutes after sunrise, the transporter is required to have a vehicle front and a rear escort/amber light when traveling on a two lane roadway and a vehicle rear escort when traveling on a four lane highway.

Transporters are responsible for ensuring they have proper oversize signs, markings, flags, and escorts as defined in the Georgia Department of Transportation Rules and Regulations.

**IT IS FURTHER**

**ORDERED:** That commercial vehicles operating outside the normal weight, height, and length restrictions under the authority of this Executive Order shall be issued permits by the Georgia Department of Public Safety. Said vehicles shall be subject to any special conditions the Georgia Department of Public Safety may list on applicable permits. Nothing in this Executive Order shall be construed to allow any vehicle to exceed weight limits posted for bridges and like structures, nor shall anything in this Executive Order be construed to relieve compliance with restrictions other than those specified in this Executive Order or from any statute, rule, order or other legal requirement not specifically waived herein. Oversize permits may be issued by the Georgia Department of Public Safety, Motor Carrier Compliance Division, during normal business hours, Monday through Friday by calling 404-624-7700 or through the Georgia Permitting and Routing Optimization System online portal at https://gapros.dot.ga.gov/.

**IT IS FURTHER**

**ORDERED:** That during preparation, response, and recovery activities for this Public Health Emergency, price gouging of goods and services necessary to support Public Health would be detrimental to the social and economic welfare of the citizens of this State, and thus Code Section 10-1-393.4, prohibiting price gouging, remains in effect.

**IT IS FURTHER**

**ORDERED:** That pursuant to Code Section 38-3-51(a), the General Assembly shall convene for a special session, beginning on March 16, 2020, at 8:00 A.M. for the purpose of concurring with or terminating this Public Health State of Emergency.

**IT IS FURTHER**

**ORDERED:** That the State of Emergency shall terminate on April 13, 2020, at 11:59 P.M., unless it is renewed by the Governor.

This 14th day of March 2020, at 10:15 A.M.



GOVERNOR



**SUPREME COURT OF GEORGIA**

FILED
Administrative Minutes
MAR 1 4 2020
Thérèse S. Barnes,
Clerk/Court Executive
SUPREME COURT OF GEORGIA

March 14, 2020
**(Amended)**

## ORDER DECLARING STATEWIDE JUDICIAL EMERGENCY

WHEREAS, the Governor has determined that a Public Health State of Emergency exists in the State of Georgia due to the spread of the Coronavirus/COVID-19, and whereas that state of emergency constitutes a "judicial emergency" pursuant to OCGA § 38-3-60 et seq., see OCGA § 38-3-60 (2).

Now therefore, pursuant to OCGA § 38-3-61, the Honorable Harold D. Melton, Chief Justice of the Supreme Court of Georgia, DOES HEREBY ORDER AND DECLARE a Statewide Judicial Emergency in the State of Georgia. The nature of this emergency is the continued transmission of Coronavirus/COVID-19 throughout the State and the potential infection of those who work in or are required to appear in our courts.

Thus, in order to protect the health, safety, and liberty of all citizens in this State, the undersigned hereby declares a Statewide Judicial Emergency affecting all courts and clerk's offices in the State as it relates to all judicial proceedings.

To the extent feasible, courts should remain open to address essential functions, and in particular courts should give priority to matters necessary to protect health, safety, and liberty of individuals. Essential functions are subject to interpretation; however, some matters that fall into the essential function category are: (1) where an immediate liberty or safety concern is present requiring the attention of the court as soon as the court is available; (2) criminal court search warrants, arrest warrants, initial appearances, and bond reviews; (3) domestic abuse temporary protective orders and restraining orders; (4) juvenile court delinquency detention hearings and emergency removal matters; and (5) mental health commitment hearings.

**Exhibit 2
Wood**

In addition, trials in any criminal case for which a jury has been empaneled and the trial has commenced as of the date of this order shall continue to conclusion, unless good cause exists to suspend the trial or declare a mistrial.  The decision whether to suspend a criminal trial or declare a mistrial rests with the judge presiding over the case.

To the extent court proceedings are held, they should be done in a manner to limit the risk of exposure, such as by videoconferencing, where possible.

Pursuant to OCGA § 38-3-62, during the period of this Order, the undersigned hereby suspends, tolls, extends, and otherwise grants relief from any deadlines or other time schedules or filing requirements imposed by otherwise applicable statutes, rules, regulations, or court orders, whether in civil or criminal cases or administrative matters, including, but not limited to any: (1) statute of limitation; (2) time within which to issue a warrant; (3) time within which to try a case for which a demand for speedy trial has been filed; (4) time within which to hold a commitment hearing; (5) deadline or other schedule regarding the detention of a juvenile; (6) time within which to return a bill of indictment or an accusation or to bring a matter before a grand jury; (7) time within which to file a writ of habeas corpus; (8) time within which discovery or any aspect thereof is to be completed; (9) time within which to serve a party; (10) time within which to appeal or to seek the right to appeal any order, ruling, or other determination; and (11) such other legal proceedings as determined to be necessary by the authorized judicial official.

**This Statewide Judicial Emergency shall terminate on April 13, 2020, at 11:59 p.m., unless otherwise extended.**

Should the state of emergency extend beyond the period indicated above or should the nature of the emergency otherwise require modification, a determination of available alternative remedies for the conduct of court business will be made as necessary, and a corresponding order will be entered and distributed in accordance with Georgia law.

2

IT IS FURTHER ORDERED, pursuant to OCGA § 38-3-63, that notice and service of a copy of this Order shall immediately be sent to the judges and clerks of all courts in this State and to the clerk of the Georgia Court of Appeals, such service to be accomplished through means to assure expeditious receipt, which include electronic means; and

IT IS FURTHER ORDERED that notice shall also be sent to the media, the State Bar of Georgia, and the officials and entities listed below and shall constitute sufficient notice of the issuance of this Order to the affected parties, counsel for the affected parties, and the public.

IT IS SO ORDERED this 14th day of March, 2020.

Chief Justice Harold D. Melton
Supreme Court of Georgia

cc:
Governor Brian P. Kemp
Lt. Governor Geoff Duncan
Speaker David Ralston
State Bar of Georgia
Administrative Office of the Courts
Judicial Council of Georgia
Council of Superior Court Clerks of Georgia
Department of Juvenile Justice
Criminal Justice Coordinating Council
Council of Accountability Court Judges
Georgia Commission on Dispute Resolution
Institute of Continuing Judicial Education of Georgia
Georgia Council of Court Administrators
Chief Justice's Commission on Professionalism
Judicial Qualifications Commission
Association County Commissioners of Georgia
Georgia Municipal Association
Georgia Sheriffs' Association
Georgia Association of Chiefs of Police
Georgia Public Defender Council

3

Prosecuting Attorneys' Council of Georgia
Department of Corrections
Department of Community Supervision
Georgia Court Reporters Association
Board of Court Reporting
State Board of Pardons and Paroles

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.

Witness my signature and the seal of said court hereto affixed the day and year last above written.

_____ , Clerk



FILED
Administrative Minutes

APR 06 2020
Therese S. Barnes,
Clerk/Court Executive
SUPREME COURT OF GEORGIA



SUPREME COURT OF GEORGIA

April 6, 2020

# ORDER EXTENDING DECLARATION OF STATEWIDE JUDICIAL EMERGENCY

Pursuant to OCGA § 38-3-61, and due to the continuing statewide emergency involving the transmission of Coronavirus/COVID-19, the Honorable Harold D. Melton, Chief Justice of the Supreme Court of Georgia, does hereby extend the March 14, 2020 (amended) Order Declaring Statewide Judicial Emergency, which would have expired on April 13, 2020 at 11:59 p.m., until Wednesday, May 13, 2020, at 11:59 p.m., unless otherwise further modified or extended. The Chief Justice will provide notice as to the expected termination of the Order at least one week in advance to allow courts to plan the transition to fuller operations.

With regard to matters not deemed essential functions under the Statewide Judicial Emergency Order, courts and litigants are encouraged to proceed to the extent feasible and consistent with public health guidance, for example through the use of teleconferences and videoconferences, to reduce backlogs when the judicial emergency ends.

With regard to all matters in this challenging time, all lawyers are reminded of their obligations of professionalism.

It is ordered, pursuant to OCGA § 38-3-63, that notice and service of a copy of this Order shall immediately be sent to the judges and clerks of all courts in this State and to the clerk of the Georgia Court of Appeals, such service to be accomplished through means to assure expeditious receipt, which include electronic means; and

It is further ordered that notice shall also be sent to the media, the State Bar of Georgia, and the officials and entities listed below and shall constitute sufficient notice of the issuance of this Order to the affected parties, counsel for the affected parties, and the public.

**Exhibit 3**
**Wood**

IT IS SO ORDERED this 6th day of April, 2020.

Chief Justice Harold D. Melton
Supreme Court of Georgia

cc:
Governor Brian P. Kemp
Lt. Governor Geoff Duncan
Speaker David Ralston
State Bar of Georgia
Administrative Office of the Courts
Judicial Council of Georgia
Council of Superior Court Clerks of Georgia
Department of Juvenile Justice
Criminal Justice Coordinating Council
Council of Accountability Court Judges
Georgia Commission on Dispute Resolution
Institute of Continuing Judicial Education of Georgia
Georgia Council of Court Administrators
Chief Justice's Commission on Professionalism
Judicial Qualifications Commission
Association County Commissioners of Georgia
Georgia Municipal Association
Georgia Sheriffs' Association
Georgia Association of Chiefs of Police
Georgia Public Defender Council
Prosecuting Attorneys' Council of Georgia
Department of Corrections
Department of Community Supervision
Georgia Court Reporters Association
Board of Court Reporting
State Board of Pardons and Paroles
Constitutional Officers Association of Georgia
Council of Magistrate Court Clerks
Council of Municipal Court Clerks

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the
minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto
affixed the day and year last above written.

, Clerk



# Judicial Qualifications Commission
## State of Georgia
www.gajqc.com

### JQC Statement on Statewide Judicial and Public Health Emergencies

**March 16, 2020 –** The Judicial Qualifications Commission of Georgia ("JQC), the State agency charged with the responsibility and authority to investigate and prosecute claims of judicial misconduct, stands ready to continue serving the citizens of Georgia during these trying times. With the unprecedented and brave decisions by Chief Justice Harold Melton and Governor Brian Kemp to swiftly and firmly address the threats posed by the spread of the Coronavirus/COVID-19, the JQC will also plan to adapt its functions to meet the needs of our community.

Beginning today, March 16, 2020, the JQC staff will primarily telework in order to do our part in lessening the chance of spreading the Coronavirus/COVID-19. While JQC staff will occasionally work from the agency's formal office space in order to complete essential Commission functions, the general telework policy will remain in effect until the Orders declaring a Statewide Judicial Emergency and Public Health Emergency are lifted. When working in the JQC's formal office space, staff and members will follow internal procedures to ensure a safe work environment and efficiently perform their necessary duties.

The Statewide Judicial Emergency, as Ordered by Chief Justice Melton, sends a direct and balanced message to the courts of Georgia, allowing for continued court functions in addressing *essential* functions necessary to protect the health, safety, and liberty of our citizens, while also recognizing the need for courts to postpone and/or cancel non-essential matters in order to avoid the potential infection of court employees and members of the public attending court. The JQC realizes that this may pose many challenges for parties, litigants, attorneys, court staff, and judges in navigating these uncharted waters. We stand ready to assist our judicial system with situations that may pose ethical dilemmas for all involved. In that vein, we also recognize that opinions may differ regarding how best to handle the novel circumstances that our world faces today. The fact remains, however, that Chief Justice Melton's Order is an overriding directive to the courts, and refusals to abide by the Order may require action by the JQC.

To that end, judges, parties, and the public are encouraged to contact the JQC staff with any questions or concerns about ethical obligations or possible misconduct. As the current landscape calls for quick responses to many of these inquiries, we will do our best to be available during and after normal work hours to address time-sensitive matters. Many members of the judiciary and the bar have already reached out for assistance, and we are committed to doing our part to help guide our State through these difficult and unusual times.

Exhibit 4
Wood

The best way to contact our agency generally is via our website, www.gajqc.com, or our office number at (404) 558-6940.  I can also be contacted via my direct office number or email.  That contact information is listed below.

Sincerely,

Chuck Boring
Director, Judicial Qualifications Commission of Georgia

Contact: Chuck Boring, Director, (404) 463-1178 or cboring@gajqc.com

xxx



# Council of Probate Court Judges of Georgia

Judge T. J. Hudson
*President (Treutlen)*

Judge Kelli Wolk
*President Elect (Cobb)*

Judge Kerri Carter
*First Vice President (Dade)*

Judge Darin McCoy
*Secretary-Treasurer (Evans)*

Judge Sarah Harris
*Immediate Past President (Bibb)*

## <u>MEMORANDUM</u>

TO:        Probate Judges

FROM:   Executive Committee
            Council of Probate Court Judges

DATE:    March 17, 2020

Below you will find clear direction and additional clarification, as provided by Chief Justice Harold D. Melton of the Supreme Court of Georgia regarding his Order Declaring Statewide Judicial Emergency, effective March 14, 2020. In addition, you will find further direction and clarification from the Council as it relates specifically to weapons carry licenses:

### <u>Direction and Clarification from Chief Justice Melton re: Statewide Judicial Emergency</u>

- The Order and Declaration of Judicial Emergency from Justice Melton **applies to every court**. It supersedes all previous and lower courts' orders.
- Georgia law and the Constitution **REQUIRES** that the courts stay open during these circumstances. If your courthouse has been closed, please address this with the chief superior court judge in your circuit. If you have any issues regarding this, they should be reported to Chief Justice Melton. The Executive Committee is also here to lend assistance if you need it, please reach out to Judge Hudson, Judge Wolk or Kevin.
- Consistency for each class of court is **STRONGLY** encouraged.
- Consistency within a circuit is **ESSENTIAL**, particularly in courts that handle traffic matters.
- **<u>DO NOT</u>** restrict access to hearings.  You may discourage non-essential persons from attending, but you cannot prohibit them.
- If hearings are conducted by teleconference or video conference, those calls should be conducted in the courtroom.

244 Washington Street SW • Suite 300 • Atlanta, GA 30334
Phone: 404-656-5171 • Fax: 404-651-6449

Exhibit 5
Wood

- The Declaration **DOES NOT** change the law. If you are required to have a hearing (e.g., guardianships, amended birth certificates), you **cannot** just sign an Order based only on agreement. You must still follow the law. If the Code says you **SHALL** do something, you still must do it.
- Extensions of time for pending matters do not need a written request. The Declaration tolls deadlines.
- Case count deadline is extended to April 15th.
- Deadlines are extended by the length of the emergency period. Not everyone will need to come in on the day after the emergency period.

### Direction and Clarification from the Executive Committee re: Weapons Carry Licenses

- It is the Council's position that weapons carry licenses **are not** an "essential" function of the court.
- The Council has been in contact with Georgia Bureau of Investigation and the Georgia Sheriffs' Association to make sure law enforcement is aware of the renewal extension and have urged them to suspend enforcement of concealed carry violations with a license that expired during the emergency period. We encourage you to communicate this to your local law enforcement agencies as well.
- Renewals – The Declaration extends the deadlines for renewals, therefore a temporary license is **not necessary**.
- *Sua Sponte* issuance of Temporary Licenses is **not supported** by the law. A license can be issued *when someone applies for a license.* If a person is **not** applying for a license, we are not authorized by law to issue a temporary license. Issuing a temporary license by mail would be a substantive change in the law.
- In addition, we have attached a suggested notice regarding the extended term of the license.

Cc:     Chief Justice Harold D. Melton – Supreme Court of Georgia
        Presiding Justice David Nahmias – Supreme Court of Georgia
        Mr. Chuck Boring – Judicial Qualifications Commission
        Mrs. Cynthia H. Clanton – Judicial Council/Administrative Office of the Courts



## Coronavirus Disease 2019 (COVID-19)

# Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)

Plan, Prepare and Respond to Coronavirus Disease 2019

> **Older adults and people who have severe underlying chronic medical conditions** like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19 illness.
> Find more information here.

### Summary of Changes to the Guidance:

Below are changes as of March 21, 2020

- Updated cleaning and disinfection guidance
- Updated best practices for conducting social distancing
- Updated strategies and recommendations that can be implemented now to respond to COVID-19

### CDC Industry Guidance

- Resources for Airlines
- Resources for the Ship Industry

### OSHA/HHS Guidance

- Guidance on Preparing Workplaces for COVID-19 🔒 ⧉

# Purpose

This interim guidance is based on what is currently known about the coronavirus disease 2019 (COVID-19). COVID-19 is a respiratory illness that can spread from person to person. The outbreak first started in China, but the virus continues to spread internationally and in the United States. The Centers for Disease Control and Prevention (CDC) will update this interim guidance as additional information becomes available.

The following interim guidance may help prevent workplace exposures to COVID-19, in non-healthcare settings. (CDC has provided separate guidance for healthcare settings.) This guidance also provides planning considerations for community spread of COVID-19.

To prevent stigma and discrimination in the workplace, use only the guidance described below to determine risk of COVID-19 infection. Do not make determinations of risk based on race or country of origin and be sure to maintain confidentiality of people with confirmed coronavirus infection. There is much more to learn about the transmissibility,

**Exhibit 6
Wood**

Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19) | CDC     4/23/20, 12:10 PM

Case 1:20-cv-01624-SCJ Document 25-1 Filed 04/24/20 Page 29 of 43

severity, and other features of COVID-19 and investigations are ongoing. Updates are available on CDC's web page.

# Preparing Workplaces for a COVID-19 Outbreak

Businesses and employers can prevent and slow the spread of COVID-19. Employers should plan to respond in a flexible way to varying levels of disease transmission in the community and be prepared to refine their business response plans as needed. According to the Occupational Safety and Health Administration (OSHA), most American workers will likely experience low (caution) or medium exposure risk levels at their job or place of employment (see OSHA guidance for employers 🔗 for more information about job risk classifications).

Businesses are strongly encouraged to coordinate with state 🔗 and local 🔗 health officials so timely and accurate information can guide appropriate responses. Local conditions will influence the decisions that public health officials make regarding community-level strategies. CDC has guidance for mitigation strategies 🔗 according to the level of community transmission or impact of COVID-19.

All employers need to consider how best to decrease the spread of COVID-19 and lower the impact in their workplace. This may include activities in one or more of the following areas:

a. reduce transmission among employees,
b. maintain healthy business operations, and
c. maintain a healthy work environment.

# Reduce Transmission Among Employees

**Actively encourage sick employees to stay home:**

- Employees who have symptoms (i.e., fever, cough, or shortness of breath) should notify their supervisor and stay home.

- Sick employees should follow CDC-recommended steps. Employees should not return to work until the criteria to discontinue home isolation are met, in consultation with healthcare providers and state and local health departments.
- Employees who are well but who have a sick family member at home with COVID-19 should notify their supervisor and follow CDC recommended precautions.

**Identify where and how workers might be exposed to COVID-19 at work:**

- See OSHA COVID-19 🔗 webpage for more information on how to protect workers from potential exposures and guidance for employers 🔗 , including steps to take for jobs according to exposure risk.
- Be aware that some employees may be at higher risk for serious illness, such as older adults and those with chronic medical conditions. Consider minimizing face-to-face contact between these employees or assign work tasks that allow them to maintain a distance of six feet from other workers, customers and visitors, or to telework if possible.

**Separate sick employees:**

- Employees who appear to have symptoms (i.e., fever, cough, or shortness of breath) upon arrival at work or who become sick during the day should immediately be separated from other employees, customers, and visitors and sent home.

- If an employee is confirmed to have COVID-19 infection, employers should inform fellow employees of their possible exposure to COVID-19 in the workplace but maintain confidentiality as required by the Americans with Disabilities Act (ADA). The employer should instruct fellow employees about how to proceed based on the CDC Public Health Recommendations for Community-Related Exposure.


**Educate employees about how they can reduce the spread of COVID-19:**

- Employees can take steps to protect themselves at work and at home. Older people and people with serious chronic medical conditions are at higher risk for complications.
- Follow the policies and procedures of your employer related to illness, cleaning and disinfecting, and work meetings and travel.
- Stay home if you are sick, except to get medical care. Learn what to do if you are sick.
- Inform your supervisor if you have a sick family member at home with COVID-19. Learn what to do if someone in your house is sick.
- Wash your hands often with soap and water for at least 20 seconds. Use hand sanitizer with at least 60% alcohol if soap and water are not available.
- Avoid touching your eyes, nose, and mouth with unwashed hands.
- Cover your mouth and nose with a tissue when you cough or sneeze or use the inside of your elbow. Throw used tissues in the trash and immediately wash hands with soap and water for at least 20 seconds. If soap and water are not available, use hand sanitizer containing at least 60% alcohol. Learn more about coughing and sneezing etiquette on the CDC website.
- Clean AND disinfect frequently touched objects and surfaces such as workstations, keyboards, telephones, handrails, and doorknobs. Dirty surfaces can be cleaned with soap and water prior to disinfection. To disinfect, use products that meet EPA's criteria for use against SARS-CoV-2 ⧉ , the cause of COVID-19, and are appropriate for the surface.
- Avoid using other employees' phones, desks, offices, or other work tools and equipment, when possible. If necessary, clean and disinfect them before and after use.
- Practice social distancing by avoiding large gatherings and maintaining distance (approximately 6 feet or 2 meters) from others when possible.


# Maintain Healthy Business Operations

**Identify a workplace coordinator** who will be responsible for COVID-19 issues and their impact at the workplace.

**Implement flexible sick leave and supportive policies and practices.**

- Ensure that sick leave policies are flexible and consistent with public health guidance and that employees are aware of and understand these policies.

- Maintain flexible policies that permit employees to stay home to care for a sick family member or take care of children due to school and childcare closures. Additional flexibilities might include giving advances on future sick leave and allowing employees to donate sick leave to each other.

- Employers that do not currently offer sick leave to some or all of their employees may want to draft non-punitive "emergency sick leave" policies.

- Employers should not require a positive COVID-19 test result or a healthcare provider's note for employees who are sick to validate their illness, qualify for sick leave, or to return to work. Healthcare provider offices and medical facilities may be extremely busy and not able to provide such documentation in a timely manner.

- Review human resources policies to make sure that policies and practices are consistent with public health recommendations and are consistent with existing state and federal workplace laws (for more information on employer responsibilities, visit the Department of Labor's ↗ and the Equal Employment Opportunity Commission's ↗ websites).

- Connect employees to employee assistance program (EAP) resources (if available) and community resources as needed. Employees may need additional social, behavioral, and other services, for example, to cope with the death of a loved one.

**Assess your essential functions** and the reliance that others and the community have on your services or products.

- Be prepared to change your business practices if needed to maintain critical operations (e.g., identify alternative suppliers, prioritize existing customers, or temporarily suspend some of your operations if needed).

- Identify alternate supply chains for critical goods and services. Some good and services may be in higher demand or unavailable.

- Talk with companies that provide your business with contract or temporary employees about the importance of sick employees staying home and encourage them to develop non-punitive leave policies.

- Talk with business partners about your response plans. Share best practices with other businesses in your communities (especially those in your supply chain), chambers of commerce, and associations to improve community response efforts.

**Determine how you will operate if absenteeism spikes** from increases in sick employees, those who stay home to care for sick family members, and those who must stay home to watch their children if dismissed from childcare programs and K-12 schools.

- Plan to monitor and respond to absenteeism at the workplace.

- Implement plans to continue your essential business functions in case you experience higher than usual

absenteeism.

- Prepare to institute flexible workplace and leave policies.
- Cross-train employees to perform essential functions so the workplace can operate even if key employees are absent.

**Consider establishing policies and practices for social distancing.** Social distancing should be implemented if recommended by state and local health authorities. Social distancing means avoiding large gatherings and maintaining distance (approximately 6 feet or 2 meters) from others when possible (e.g., breakrooms and cafeterias). Strategies that business could use include:

- Implementing flexible worksites (e.g., telework)
- Implementing flexible work hours (e.g., staggered shifts)
- Increasing physical space between employees at the worksite
- Increasing physical space between employees and customers (e.g., drive through, partitions)
- Implementing flexible meeting and travel options (e.g., postpone non-essential meetings or events)
- Downsizing operations
- Delivering services remotely (e.g. phone, video, or web)
- Delivering products through curbside pick-up or delivery

**Employers with more than one business location** are encouraged to provide local managers with the authority to take appropriate actions outlined in their COVID-19 response plan based on local conditions.

# Maintain a healthy work environment

**Consider improving the engineering controls using the building ventilation system.** This may include some or all of the following activities:

- Increase ventilation rates.
- Increase the percentage of outdoor air that circulates into the system.

**Support respiratory etiquette and hand hygiene for employees, customers, and worksite visitors:**

- Provide tissues and no-touch disposal receptacles.
- Provide soap and water in the workplace. If soap and water are not readily available, use alcohol-based hand sanitizer that is at least 60% alcohol. If hands are visibly dirty, soap and water should be chosen over hand sanitizer. Ensure that adequate supplies are maintained.
- Place hand sanitizers in multiple locations to encourage hand hygiene.

- Place posters that encourage hand hygiene to help stop the spread at the entrance to your workplace and in other workplace areas where they are likely to be seen.
- Discourage handshaking – encourage the use of other noncontact methods of greeting.
- Direct employees to visit the coughing and sneezing etiquette and clean hands webpage for more information.

**Perform routine environmental cleaning and disinfection:**

- Routinely clean and disinfect all frequently touched surfaces in the workplace, such as workstations, keyboards, telephones, handrails, and doorknobs.
  - If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.
  - For disinfection, most common EPA-registered household disinfectants should be effective. A list of products that are EPA-approved for use against the virus that causes COVID-19 is available here 📄 ↗ . Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

- Discourage workers from using other workers' phones, desks, offices, or other work tools and equipment, when possible. If necessary, clean and disinfect them before and after use.
- Provide disposable wipes so that commonly used surfaces (for example, doorknobs, keyboards, remote controls, desks, other work tools and equipment) can be wiped down by employees before each use. To disinfect, use products that meet EPA's criteria for use against SARS-Cov-2 ↗ , the cause of COVID-19, and are appropriate for the surface.

**Perform enhanced cleaning and disinfection after persons suspected/confirmed to have COVID-19 have been in the facility:**

- If a sick employee is suspected or confirmed to have COVID-19, follow the CDC cleaning and disinfection recommendations.

**Advise employees before traveling to take additional preparations:**

- Check the CDC's Traveler's Health Notices for the latest guidance and recommendations for each country to which you will travel. Specific travel information for travelers going to and returning from countries with travel advisories, and information for aircrew, can be found on the CDC website.
- Advise employees to check themselves for symptoms of COVID-19 (i.e., fever, cough, or shortness of breath) before starting travel and notify their supervisor and stay home if they are sick.
- Ensure employees who become sick while traveling or on temporary assignment understand that they should notify their supervisor and promptly call a healthcare provider for advice if needed.
- If outside the United States, sick employees should follow company policy for obtaining medical care or contact a healthcare provider or overseas medical assistance company to assist them with finding an appropriate healthcare

provider in that country. A U.S. consular officer can help locate healthcare services. However, U.S. embassies, consulates, and military facilities do not have the legal authority, capability, and resources to evacuate or give medicines, vaccines, or medical care to private U.S. citizens overseas.

**Take care when attending meetings and gatherings:**

- Carefully consider whether travel is necessary.
- Consider using videoconferencing or teleconferencing when possible for work-related meetings and gatherings.
- Consider canceling, adjusting, or postponing large work-related meetings or gatherings that can only occur in-person.
- When videoconferencing or teleconferencing is not possible, hold meetings in open, well-ventilated spaces.

# Resources for more information:

## CDC Guidance

- COVID-19 Website
- What You Need to Know About COVID-19 🔴
- What to Do If You Are Sick With COVID-19 🔴
- Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposure in Travel-associated or Community Settings
- Health Alert Network
- Travelers' Health Website
- National Institute for Occupational Safety and Health's Small Business International Travel Resource Travel Planner 🔴
- Coronavirus Disease 2019 Recommendations for Ships
- Coronavirus Disease 2019 Recommendations for Airlines and Airline crew
- Persons at Higher Risk of Severe Illness

## Other Federal Agencies and Partners

- OSHA COVID-19 Website 🔗

- OSHA Guidance for Preparing Workplaces for COVID-19 🔴 🔗

Page last reviewed: April 9, 2020



# THE STATE OF GEORGIA

## EXECUTIVE ORDER

---

BY THE GOVERNOR:

### EXECUTIVE ORDER TO ENSURE A SAFE & HEALTHY GEORGIA

**WHEREAS:** On March 14, 2020, due to the impact of COVID-19 on the State of Georgia, I issued Executive Order No. 03.14.20.01, declaring a Public Health State of Emergency in Georgia; and

**WHEREAS:** The Georgia General Assembly concurred with Executive Order 03.14.20.01 by joint resolution on March 16, 2020; and

**WHEREAS:** The number of COVID-19 cases in Georgia continues to rise; and

**WHEREAS:** The Georgia Department of Public Health has determined that COVID-19 is spreading throughout communities, requiring the implementation of certain restrictions to limit the spread; and

**WHEREAS:** The Centers for Disease Control and Prevention has determined that older adults, people of any age who have serious underlying medical conditions, and certain other people groups may be at higher risk for more serious complications from COVID-19; and

**WHEREAS:** Code Section 38-3-51(c)(4) vests the Governor with the power to perform and exercise such other functions, powers, and duties as may be deemed necessary to promote and secure the safety and protection of the civilian population; and

**WHEREAS:** Code Section 38-3-51(d)(1) vests the Governor with the power to suspend any regulatory statute prescribing the procedures for conduct of state business, or the orders, rules, or regulations of any state agency if strict compliance with any statute, order, rule, or regulation would in any way prevent, hinder, or delay necessary action in coping with the emergency or disaster; and

**WHEREAS:** Code Sections 31-2A-4 and 31-12-4 vests the Department of Public Health with the power to segregate and isolate certain individuals with certain communicable diseases or conditions when said

Exhibit 7
Wood

individuals' exposure to the general population is likely to endanger the health of others; and

WHEREAS:     In consultation with the Governor's Coronavirus Task Force and health and emergency preparedness officials, I have determined that the following temporary actions are necessary and appropriate to protect the health, safety, and welfare of Georgia's residents and visitors.

NOW, THEREFORE, PURSUANT TO AFOREMENTIONED GEORGIA LAW AND THE AUTHORITY VESTED IN ME AS GOVERNOR OF THE STATE OF GEORGIA, IT IS HEREBY

ORDERED:     All residents and visitors of the State of Georgia shall practice social distancing and sanitation in accordance with this Order and guidelines published by the Centers for Disease Control and Prevention.

IT IS FURTHER

ORDERED:     No business, establishment, corporation, non-profit corporation, organization, or county or municipal government shall allow more than ten (10) persons to be gathered at a single location if such gathering requires persons to stand or to be seated within six (6) feet of any other person. This provision shall not apply to cohabitating persons outside of their homes, family units or roommates residing together in private homes, or entities defined as "Critical Infrastructure" by this Order.

IT IS FURTHER

ORDERED:     That as used in this Order, the term "single location" shall be interpreted to mean a space where all persons gathered cannot maintain at least six (6) feet of distance between themselves and any other person. The term "single location" shall not include private residences.

IT IS FURTHER

ORDERED:     That all residents and visitors of the State of Georgia are required to shelter in place within their homes or places of residence, meaning remaining in their place of residence and taking every possible precaution to limit social interaction to prevent the spread or infection of COVID-19 to themselves or any other person, unless they are:

1.   Conducting or participating in Essential Services;

2. Performing Necessary Travel;

3. Are engaged in the performance of, or travel to and from, the performance of Minimum Basic Operations for a business, establishment, corporation, non-profit corporation, or organization not classified as Critical Infrastructure; or

4. Are part of the workforce for Critical Infrastructure and are actively engaged in the performance of, or travel to and from, their respective employment.

**IT IS FURTHER**

**ORDERED:**   That Essential Services permitted pursuant to the provisions of this Order are limited to the following:

1. Obtaining necessary supplies and services for family or household members, such as food and supplies for household consumption and use, medical supplies or medication, supplies and equipment needed to work from home, and products needed to maintain safety, sanitation, and essential maintenance of the home or residence. Preference should be given to online ordering, home delivery, and curbside pick-up services wherever possible as opposed to in-store shopping.

2. Engaging in activities essential for the health and safety of family or household members, such as seeking medical, behavioral health, or emergency services.

3. Engaging in outdoor exercise activities so long as a minimum distance of six (6) feet is maintained during such activities between all persons who are not occupants of the same household or residence.

**IT IS FURTHER**

**ORDERED:**   That Necessary Travel permitted under this Order is limited to such travel as is required to conduct or participate in Essential Services, Minimum Basic Operations, or Critical Infrastructure as defined by this Order.

**IT IS FURTHER**

**ORDERED:**   That Minimum Basic Operations are limited to:

1. The minimum necessary activities to maintain the value of a business, establishment, corporation, non-profit corporation, or organization, provide services, manage inventory, ensure security, process payroll and employee benefits, or for related functions. Such minimum necessary activities include remaining open to the public subject to the restrictions of this Order.

2. The minimum necessary activities to facilitate employees or volunteers being able to work remotely from their residences or members or patrons being able to participate remotely from their residences.
3. Instances where employees are working outdoors without regular contact with other persons, such as delivery services, contractors, landscape businesses, and agricultural industry services.

**IT IS FURTHER**

**ORDERED**:     That all businesses, establishments, corporations, non-profit corporations, or organizations that are _not_ Critical Infrastructure shall only engage in Minimum Basic Operations as defined in this Order during the effective dates of this Order. Such entities shall also implement measures which mitigate the exposure and spread of COVID-19 among its workforce. Such measures shall include the following:

1. Screening and evaluating workers who exhibit signs of illness, such as a fever over 100.4 degrees Fahrenheit, cough, or shortness of breath;
2. Requiring workers who exhibit signs of illness to not report to work or to seek medical attention;
3. Enhancing sanitation of the workplace as appropriate;
4. Requiring hand washing or sanitation by workers at appropriate places within the business location;
5. Providing personal protective equipment as available and appropriate to the function and location of the worker within the business location;
6. Prohibiting gatherings of workers during working hours;
7. Permitting workers to take breaks and meals outside, in their office or personal workspace, or in such other areas where proper social distancing is attainable;
8. Implementing teleworking for all possible workers;
9. Implementing staggered shifts for all possible workers;
10. Holding all meetings and conferences virtually, wherever possible;
11. Delivering intangible services remotely wherever possible;
12. Discouraging workers from using other workers' phones, desks, offices, or other work tools and equipment;
13. Prohibiting handshaking and other unnecessary person-to-person contact in the workplace;
14. Placing notices that encourage hand hygiene at the entrance to the workplace and in other workplace areas where they are likely to be seen;
15. Suspending the use of Personal Identification Number ("PIN") pads, PIN entry devices, electronic signature capture,

and any other credit card receipt signature requirements to the extent such suspension is permitted by agreements with credit card companies and credit agencies;

16. Enforcing social distancing of non-cohabitating persons while present on such entity's leased or owned property;

17. For retailers and service providers, providing for alternative points of sale outside of buildings, including curbside pick-up or delivery of products and/or services if an alternative point of sale is permitted under Georgia law;

18. Increasing physical space between workers and customers;

19. Providing disinfectant and sanitation products for workers to clean their workspace, equipment, and tools;

20. Increasing physical space between workers' worksites to at least six (6) feet.

**IT IS FURTHER**

**ORDERED:** The term "Critical Infrastructure" shall refer to businesses, establishments, corporations, non-profit corporations, and organizations as defined by the U.S. Department of Homeland Security as "essential critical infrastructure workforce," in guidance dated March 19, 2020, and revised on March 28, 2020, and those suppliers which provide essential goods and services to the critical infrastructure workforce as well as entities that provide legal services, home hospice, and non-profit corporations or non-profit organizations that offer food distribution or other health or mental health services.  The operation of Critical Infrastructure shall not be impeded by county, municipal, or local ordinance.

Critical Infrastructure that continues in-person operation during the effective dates of this Order shall implement measures which mitigate the exposure and spread of COVID-19 among its workforce.  Such measures may include, but shall not be limited to:

1. Screening and evaluating workers who exhibit signs of illness, such as a fever over 100.4 degrees Fahrenheit, cough, or shortness of breath;

2. Requiring workers who exhibit signs of illness to not report to work or to seek medical attention;

3. Enhancing sanitation of the workplace as appropriate;

4. Requiring hand washing or sanitation by workers at appropriate places within the business location;

5. Providing personal protective equipment as available and appropriate to the function and location of the worker within the business location;

6. Prohibiting gatherings of workers during working hours;

7. Permitting workers to take breaks and lunch outside, in their office or personal workspace, or in such other areas where proper social distancing is attainable;
8. Implementing teleworking for all possible workers;
9. Implementing staggered shifts for all possible workers;
10. Holding all meetings and conferences virtually, wherever possible;
11. Delivering intangible services remotely wherever possible;
12. Discouraging workers from using other workers' phones, desks, offices, or other work tools and equipment;
13. Providing disinfectant and sanitation products for workers to clean their workspace, equipment, and tools;
14. Prohibiting handshaking and other unnecessary person-to-person contact in the workplace; and
15. Placing notices that encourage hand hygiene at the entrance to the workplace and in other workplace areas where they are likely to be seen; and
16. Suspending the use of Personal Identification Number ("PIN") pads, PIN entry devices, electronic signature capture, and any other credit card receipt signature requirements to the extent such suspension is permitted by agreements with credit card companies and credit agencies.

**IT IS FURTHER**

**ORDERED:**    That the Georgia Department of Economic Development is authorized to issue guidance to any business, corporation, organization, or industry trade group regarding its status as Critical Infrastructure. This guidance shall not require a finding of fact but shall be in writing and shall be considered a final agency action for the purpose of proceedings under Code Section 50-13-19.

**IT IS FURTHER**

**ORDERED:**    All restaurants and private social clubs shall cease providing dine-in services.  Takeout, curbside pick-up, and delivery are permitted in accordance with the provisions of this Order.

This provision shall not limit the operation of dine-in services in hospitals, healthcare facilities, nursing homes, or other long-term care facilities; however, to the extent possible, such facilities should offer in-room dining.

**IT IS FURTHER**

**ORDERED:**    That all gyms, fitness centers, bowling alleys, theaters, live performance venues, operators of amusement rides as defined by

Code Section 25-15-51, body art studios permitted pursuant to Code Section 31-40-2, businesses registered pursuant to Code Sections 43-10-11 and 43-10-18, estheticians as defined by Code Section 43-10-1(8), hair designers as defined by Code Section 43-10-1(9), persons licensed to practice massage therapy pursuant to Code Section 43-24A-8, and businesses which possess a license to operate as or otherwise meet the definition of "bar" as defined by Code Section 3-1-2(2.1), shall cease in-person operations and shall close to the public while this Order is in effect.

IT IS FURTHER

ORDERED:        That persons required to shelter in place under any provision of this Order shall not receive visitors, except as follows:

1. Visitors providing medical, behavioral health, or emergency services or medical supplies or medication, including home hospice;
2. Visitors providing support for the person to conduct activities of daily living or instrumental activities of daily living;
3. Visitors providing necessary supplies and services, such as food and supplies for household consumption and use, supplies and equipment needed to work from home, and products needed to maintain safety, sanitation, and essential maintenance of the home or residence; or
4. Visitors received during end-of-life circumstances.

To the extent practicable under the circumstances, visitors shall maintain a minimum distance of six (6) feet between themselves and all other occupants of the person's home or residence. Any visitors visiting for the sole purpose of delivering medication, supplies, or other tangible goods shall, to the extent practicable, deliver such items in a manner that does not require in-person contact or require the deliverer to enter the person's home or residence.

IT IS FURTHER

ORDERED:        That the provisions of this Order related to visitors listed in the immediately preceding paragraph shall be strictly enforced against nursing homes or other long-term care facilities, including inpatient hospice, assisted living communities, personal care homes, intermediate care homes, community living arrangements, and community integration homes.

IT IS FURTHER

ORDERED:        That an exception to any shelter-in-place requirement set forth hereunder applies in the event of an emergency. In such cases,

persons are encouraged to leave their homes or residences and shelter in place in accordance with the rules included in this Order at a safe alternate location.  Persons experiencing homelessness are urged to obtain shelter and to contact governmental and other entities for assistance.

IT IS FURTHER

ORDERED:    That the Department of Public Health, the Department of Public Safety, or any other state department or state officer deputized by the Governor or the Georgia Emergency Management and Homeland Security Agency are, after providing reasonable notice, authorized to mandate the closure of any business, establishment, corporation, non-profit corporation, or organization not in compliance with this Order for a period not to extend beyond the term of this Order.

IT IS FURTHER

ORDERED:    That the Adjutant General of the Georgia National Guard and the Commissioner of the Department of Public Safety shall provide resources as requested to assist in the enforcement of this Order.

IT IS FURTHER

ORDERED:    That pursuant to Code Section 38-3-51, the powers of counties and cities conveyed in Titles 36 and 38, including those specific powers enumerated in Code Sections 36-5-22.1 and 36-35-3 are hereby suspended to the extent of suspending enforcement of any local ordinance or order adopted or issued since March 1, 2020, with the stated purpose or effect of responding to a public health state of emergency, ordering residents to shelter-in-place, ordering a quarantine, or combatting the spread of coronavirus or COVID-19 that in any way conflicts, varies, or differs from the terms of this Order.  Enforcement of all such ordinances and orders is hereby suspended and no county or municipality shall adopt any similar ordinance or order while this Order is in effect, except for such ordinances or orders as are designed to enforce compliance with this Order.

IT IS FURTHER

ORDERED:    That if one or more of the provisions contained in this Order shall conflict with the provisions of any previous Executive Order or Agency Administrative Order, the provisions of this Order shall control. Further, in the event of any conflict, the provisions of any quarantine or isolation Order issued to a specific person by the Department of Public Health shall control.

**IT IS FURTHER**

**ORDERED**:        That nothing in this Order shall be construed to suspend or limit the sale, dispensing, or transportation of firearms or ammunition, or any component thereof.

**IT IS FURTHER**

**ORDERED**:        That pursuant to Code Section 38-3-7, any person who violates this Order shall be guilty of a misdemeanor.   Officials enforcing this Order should take reasonable steps to provide notice prior to issuing a citation or making an arrest.

**IT IS FURTHER**

**ORDERED**:        This Order rescinds and replaces Executive Order 03.23.20.01.

**IT IS FURTHER**

**ORDERED**:        That if one or more of the provisions contained in this Order shall be held to be invalid, in violation of the Georgia Constitution, in violation of Georgia law, or unenforceable in any respect, such invalidity, violation, or unenforceability shall not affect any other provisions of this Order, but, in such case, this Order shall be construed as if such invalid, illegal, or unenforceable provision had never been contained within the Order.

**IT IS FURTHER**

**ORDERED**:        All provisions of the Order shall become effective for a period beginning at 6:00 P.M. on Friday, April 3, 2020, and expiring at 11:59 P.M. on Monday, April 13, 2020.

This 2nd day of April 2020, at **3:12** P.M.

_____
**GOVERNOR**