IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LISA WALTERS, et al.,

               )
               )
    Plaintiffs,          )       CIVIL ACTION FILE NO.:
               )
vs.                    )       1:20-cv-1624-SCJ
               )
BRIAN KEMP, et al.      )
               )
    Defendants.      )

**RESPONSE OF GOVERNOR KEMP AND COLONEL VOWELL TO
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
OR PRELIMINARY INJUNCTION**

COME NOW Defendants Brian Kemp, Governor of the State of Georgia,

and Colonel Gary Vowell, Commissioner of the Georgia Department of Public

Safety, and submit this Response to Plaintiffs' Motion for Temporary Restraining

Order or alternatively, Motion for Preliminary Injunction (Doc. 2), showing the

Court as follows:

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Lisa Walters, Second Amendment Foundation ("SAF"), and

Firearms Policy Coalition, Inc. ("FPC"), filed the underlying 42 U.S.C. § 1983

lawsuit against Governor Kemp and Colonel Vowell in their official capacities

("State Defendants"), and Cherokee County and Probate Judge Keith Wood

("County Defendants"),[1] alleging violations of the Second Amendment as applied to the State through the Fourteenth Amendment. (Doc. 1). A similar suit was filed in early April and this Court has already denied a TRO in that action. *Carter v. Kemp,* No. 20-cv-1517, Order on Motion for Temporary Restraining Order (N.D.Ga. April 20, 2020).

Allegations of Plaintiffs' Complaint

Plaintiffs allege that Governor Kemp is the chief executive officer for the State of Georgia and obligated to ensure that laws are faithfully executed. (Doc. 1, ¶ 7). Plaintiffs further allege that Colonel Vowell is the chief executive for the Department of Public Safety and charged with overseeing, directing, implementing, and executing the State's regulatory schemes, laws, and enforcement policies, including O.C.G.A. § 16-11-126, which is the statute at issue in this lawsuit. (*Id.*, ¶ 8). More specifically, Plaintiffs contend that the regulatory framework outlined in O.C.G.A. § 16-11-126—which generally requires a Georgia weapons carry license ("GWL") in order to carry a loaded handgun beyond one's home, automobile, and place of business—violates the Second Amendment. (*Id.*, ¶¶ 11-12, 26). Plaintiffs allege that O.C.G.A. § 16-11-126 requires an application, fingerprinting, background check, and fees for individuals like Plaintiff Walters to

---

[1] The undersigned counsel only represent Governor Kemp and Colonel Vowell.

obtain a GWL, but contains exemptions for several other categories of individuals.[2]
(*Id.*, ¶¶ 15, 19-23). Plaintiffs contend that the exemptions are not supported by any legislative findings or declarations to justify why the exempted individuals do not require a license while others, like Plaintiff Walters, are required to obtain a GWL. (*Id.*, ¶¶ 21, 23).

Plaintiffs further allege that the County Defendants have stopped accepting new GWL applications during the public health state of emergency and judicial emergency declaration that were issued in response to the COVID-19 public health crisis. (*Id.*, ¶¶ 28-30). Plaintiffs contend that Plaintiff Walters would qualify for a GWL if given the opportunity to apply. (*Id.*, ¶ 32). Plaintiffs allege that without a GWL, Plaintiff Walters and others like her could be charged with a misdemeanor under O.C.G.A. § 16-11-126, and disqualified from obtaining a GWL for five years if convicted. (*Id.*, ¶¶ 16-17). Plaintiffs contend that the State, under the direction of Colonel Vowell, "routinely enforces" O.C.G.A. § 16-11-126 against individuals who possess handguns outside of their homes, automobiles, and places

---

[2] The exempted categories include peace officers, wardens, persons in military service, persons fulfilling defense contracts where possession is necessary for the contract, district attorneys and some of their personnel, state court solicitors-general and some of their personnel, designated employees of the State Board of Pardons and Paroles, Attorney General and designated staff, community supervision officers, public safety directors, explosive ordinance disposal technicians, current and former judges and justices, U.S. Attorneys and Assistant U.S. Attorneys, county medical examiners and coroners, superior court clerks, and magistrate court constables. O.C.G.A. § 16-11-130(a)(1)-(16).

of business without a GWL. (*Id.*, ¶ 14). Plaintiffs offer no evidence in support of this contention. (*See generally* Docs. 1, 2).

In relief, Plaintiffs seek: (1) a declaration that the Second Amendment guarantees a right to carry a loaded handgun on one's person for self-defense in public and outside of one's home, automobile, and place of business; (2) a declaration that O.C.G.A. § 16-11-126 and its enforcement violate the Second Amendment; (3) a declaration that the County Defendants' order and policies violate the Second Amendment; (4) an injunction prohibiting Governor Kemp or his employees, officers, agents, or representatives from enforcing O.C.G.A. § 16-11-126; (4) an injunction prohibiting Colonel Vowell or his employees, officers, agents, or representatives from enforcing O.C.G.A. § 16-11-126; (5) an injunction prohibiting the County Defendants from refusing to process GWL applications; (6) nominal damages against the County Defendants; and (7) attorney's fees and expenses. (*Id.*, ¶¶ 56-64).

Plaintiffs' Motion for TRO or Preliminary Injunction

Plaintiffs' Motion does not articulate what specific relief they are seeking, but does reiterate the allegations of Plaintiffs' Complaint. (*See generally* Doc. 2). The State Defendants assume for purposes of this Response that Plaintiffs' Motion for TRO or preliminary injunction seeks, at least in part, to enjoin enforcement of O.C.G.A. § 16-11-126 during the period of time that license applications are not

being processed. Plaintiffs argue that, at least as applied during this period, O.C.G.A. § 16-11-126 violates the Second Amendment and cannot withstand any level of scrutiny because it amounts to a 'categorical ban' on the carrying of loaded handguns in public for self-defense by persons that are not prohibited by law from possession. (Doc. 2-1, pp. 7-22). Plaintiffs further contend that because Georgia's regulatory scheme carves out exemptions for certain categories of persons who are not required to have a GWL, the entire framework is unconstitutional. (*Id.*, pp. 18-21). Finally, Plaintiffs submit that they will suffer irreparable injury in the absence of an injunction because a Second Amendment violation in and of itself establishes irreparable harm, and they face a reasonable fear and threat of being prosecuted under O.C.G.A. § 16-11-126. (*Id.*, pp. 22-23). Conversely, Plaintiffs contend that the State has other methods of addressing specific conduct and crimes relating to unlawful firearm possession. (*Id.*, pp. 23-24).

Evidence Regarding O.C.G.A. § 16-11-126 Enforcement

The Department of Public Safety ("DPS") is comprised of the Georgia State Patrol, Georgia Capitol Police, and the Motor Carrier Compliance Division ("MCCD"), with 1,071 law enforcement officers posted in regions across the State of Georgia. (*See* Declaration of Sgt. Gary Langford, attached hereto as Exhibit 1, ¶ 2). Under Georgia law, a person carrying a weapon is not subject to detention for the sole purpose of investigating whether they have a weapons carry license. (*Id.*,

¶ 4). DPS Officers are taught that they may not detain an individual to investigate whether or not the individual has a Georgia weapons license and that they should treat every encounter with an individual possessing a weapon as though that individual has a license. (*Id.*, ¶¶ 6-9). Officers patrolling Capitol Square do not investigate whether an individual has a weapons license unless the officer has a minimum of reasonable, articulable suspicion that a crime—separate from any weapons carry license violation—is being committed or has been committed. (*Id.*, ¶ 7). Officers at the Capitol have been instructed that when members of the public carry weapons inside the Capitol, up to the screening checkpoint, those individuals have a right to retreat to put the weapon back in their vehicle; they do not ask whether the individual has a Georgia weapons license. (*Id.*, ¶ 8). State Trooper and MCCD Officers do not investigate whether or not a motorist has a Georgia weapons carry license during a traffic stop for minor traffic violations. (*Id.*, ¶ 10). State Troopers are instructed that if they pull someone over in their vehicle, and the individual has a weapon, the traffic stop alone is not sufficient to investigate whether or not the individual has a Georgia weapons license, even if the individual has exited the vehicle with their weapon. (*Id.*, ¶¶ 9-10). If a weapon is possessed by an occupant of a vehicle during a traffic stop and the reason for the stop escalates, then the DPS officers may further investigate the lawfulness of possession of the weapon. (*Id.*, ¶ 10). With escalations, a citation for violation of

6

O.C.G.A. §16-11-126 is generally a lesser included charge. For example, an escalation would arise when an occupant's status would make the possession of the weapon illegal, including possession by a convicted felon or possession by a minor under the age of 18. An escalation could also arise when there is reasonable articulable suspicion or probable cause of other criminal activity, such as possession during the commission of certain crimes, which would include theft of the motor vehicle. (*Id.*)

For the last two years, the Georgia State Patrol has issued a total of 14 citations for the offense of carrying a weapon without a license in violation of O.C.G.A. § 16-11-126, and 3 of the 14 total citations were issued to 1 individual at the time of a single arrest. (*Id.*, ¶¶ 13-14). Each time a citation was issued for the offense of carrying a weapon without a valid weapons-carry license, citations were also issued for other distinct offenses that resulted in an arrest. (*Id.*, ¶¶ 15-16). The Georgia Capitol Police and MCCD have not issued any citations for a violation of O.C.G.A. § 16-11-126 in the past two years. (*Id.*, ¶ 12).

For the reasons below, Plaintiffs' Motion for a TRO or PI should be denied.

## ARGUMENT AND CITATION TO AUTHORITY

The chief function of a TRO or preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001). A

TRO or preliminary injunction is only appropriate where the movant demonstrates that: (a) there is a substantial likelihood of success on the merits; (b) the preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that a preliminary injunction would cause to the non-movant; and (d) the preliminary injunction would not be adverse to the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). The burden of persuasion as to all four requirements is on the moving party. *United States v. Jefferson County*, 720 F. 2d 1511 (11th Cir. 1983).

The standard for granting such relief is high. It "is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974). The Eleventh Circuit has instructed that courts should be even more tentative in issuing injunctions when the party to be enjoined is a state governmental entity:

> [e]quitable remedies are powerful, and with power comes responsibility for its careful exercise. These remedies can affect nonparties to the litigation in which they are sought; and when, as in this case, they are sought to be applied to officials of one sovereign by the courts of another, they can impair comity, the mutual respect of sovereigns—a legitimate interest even of such constrained sovereigns as the states and the federal government . . . [T]here is not an absolute right to an injunction in a case in which it would impair or affront the sovereign powers or dignity of a state . . . .

*McKusick v. City of Melbourne, Fla.*, 96 F.3d 478, 487-88 (11th Cir. 1996).

Applying these standards, Plaintiffs' Motion for TRO or PI should be denied.

## I. Plaintiffs Cannot Establish a Substantial Likelihood of Prevailing on the Merits of Their Claims.

Plaintiffs have little to no likelihood of success on the merits of their claims against the State Defendants. First, Plaintiffs lack standing to bring this action against the State Defendants because they cannot establish a concrete injury. Second, to the extent Plaintiffs' alleged injuries are premised on the actions of other government officials, Plaintiffs lack standing because their injuries are not traceable to the State Defendants. Plaintiffs' claims are also barred by the Eleventh Amendment. Fourth, to the extent Plaintiffs seek to hold the State Defendants liable for the alleged failure of the County Defendants, the claims are barred because the State Defendants have no control over the judiciary. Finally, Plaintiffs are not likely to prevail on the merits of their Second Amendment claims.

### A. Plaintiffs Lack Standing To Challenge O.C.G.A. § 16-11-126.

Article III of the Constitution restricts judicial power "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). "Standing doctrine 'reflect[s] this fundamental limitation' and 'requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the

controversy as to warrant . . . invocation of federal court jurisdiction.'" *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018) (quoting *Summers*, 555 U.S. at 492). This limitation is "founded in concern about the proper – and properly limited – role of the courts in a democratic society." *Summers*, 555 U.S. at 492.

The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Standing elements are "not mere pleading requirements, but rather an indispensable part of the plaintiff's case," and the manner and degree of evidence required to demonstrate the existence of standing varies depending upon the stage of the litigation. *Ga. Republican Party*, 888 F.3d at 1201.

"[A] party who seeks a preliminary injunction must show a 'substantial likelihood of standing,' [and a] party who fails to show a 'substantial likelihood of standing' is not entitled to a preliminary injunction." *Food & Water Watch v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

> It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must

be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*U.S. v. Hays*, 515 U.S. 737, 742-743 (1995) (quoting *Lujan*, 504 U.S. at 560-561).

A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Hays*, 515 U.S. at 743. An injury in fact must be concrete. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* (quoting Black's Law Dictionary 479 (9th ed. 2009)). The Supreme Court has explained:

> When we have used the adjective "concrete," we have meant to convey the usual meaning of the term — "real," and not "abstract." Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967). Concreteness, therefore, is quite different from particularization.

*Spokeo*, 136 S. Ct. at 1548. The injury must also be "fairly traceable" to the challenged conduct. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Here, both the individual and organizational Plaintiffs have failed to articulate any concrete injury, and both have failed to demonstrate facts sufficient to establish a

causal connection that is "fairly traceable" to either Governor Kemp or Colonel Vowell.

### 1. Plaintiff Walters Has Not Established Standing.

As in the *Carter* litigation,[3] Plaintiff Walters repeatedly cites "fear of arrest and prosecution" in support of her request for preliminary injunctive relief. (Doc. 2-1 at 3, 5, 23; Doc. 2-5 ¶ 22). However, any fear of arrest and prosecution is speculative and not reasonable in light of state law *prohibiting* law enforcement officers from detaining Plaintiff to inquire about her permit.[4] *See* O.C.G.A. § 16-11-137(b). In addition, as this Court recognized in *Carter*, although Plaintiffs characterize the requested relief as necessary to practice self-defense in public, Georgia law already provides an "absolute defense" to any violation of O.C.G.A. § 16-11-126 where the individual is acting in the "[d]efense of self or others." O.C.G.A. § 16-11-138; *see also Johnson v. State*, 2020 Ga. LEXIS 136, at *6-7 (Feb. 28, 2020). Defendants recognize that an "actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [the] law." *Driehaus*, 573

---

[3] No. 20-cv-1517 (N.D.Ga. 2020).

[4] Plaintiffs' allegations regarding enforcement of the statute are based only on "information and belief" rather than any personal knowledge. Doc. 2-1 at 2. "When the primary evidence introduced is . . . on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for preliminary injunction." *Touchston v. McDermott*, 120 F. Supp. 2d 1055, 1059 (M.D. Fla. 2000), *aff'd* 234 F.3d 1133 (11th Cir. 2000) (*en banc*) (quoting 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (2d ed. 1995)).

U.S. at 158-159. However, there must be "a credible threat of prosecution" under the challenged statute. *Id.* at 159 (quoting *Babbitt v. Farm Workers,* 442 U. S. 289, 298 (1979)). Again, as this Court stated in *Carter*, "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases." *Carter*, No. 1:20-cv-1517-SCJ, Order on Motion for Temporary Restraining Order at 11-12 (N.D. Ga. April 20, 2020) (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). Here, there is no threat of prosecution because law enforcement officers are prohibited by statute from detaining anyone for the purpose of establishing whether they have a license. In other words, unless law enforcement has "a minimum of reasonable, articulable suspicion that a crime is being committed or has been committed," (Exhibit 1, ¶¶ 7, 10) there is no possibility of arrest and prosecution. In fact, during the past two years, the Department of Public Safety ("DPS") has only issued fourteen (14) citations, to twelve (12) individuals, for violation of O.C.G.A. § 16-11-126(h). In each case, the underlying cause of the traffic stop was the suspected commission of a separate and distinct criminal offense. (Exhibit 1, ¶ 16). DPS trains its officers to "treat every encounter with an individual possessing a weapon as though that individual has a Georgia weapons license." (*Id.*, ¶ 6). State Troopers are similarly instructed, and are "instructed that if they pull over a vehicle, and the driver or passenger has a weapon, the traffic stop is *not* sufficient to investigate whether or

not the individual has a Georgia weapons carry license, even if the individual has exited the vehicle with their weapon."[5] (*Id.*, ¶ 9)

Under these circumstances, a generalized fear that Plaintiff will be prosecuted for carrying a gun without a license is not sufficiently concrete to confer standing. *Clapper*, 568 U.S. at 410 (rejecting "reasonable likelihood" of injury as sufficient to meet the injury in fact standard). Here the Complaint seeks to address purely speculative injuries.

Plaintiffs' Motion for TRO or Preliminary Injunction is premised on their current inability to apply for a GWL. Despite general language suggesting that they are attacking the statute more broadly, their Complaint is challenging their inability to possess a weapon because of their inability to obtain a license. (Doc. 1, ¶¶ 12, 31, 44, 48). Similarly, Plaintiffs' Motion repeatedly characterizes their "injury" as the "total ban" on their lawful possession of a weapon. (Doc. 2-1, pp. 1-2, 4, 5). That "total ban" is a result of a judicial emergency and other government officials' decision to suspend issuing licenses and is not "fairly . . . traceable" to either State Defendant's conduct "as opposed to the action of . . . a

---

[5] Of course, DPS has no control over local law enforcement agencies. However, the statutory prohibition on detention solely to investigate whether someone has a license is equally applicable to other law enforcement agencies. Moreover, the burden is on Plaintiffs to demonstrate a concrete injury, not on Defendants to disprove injury. *Lujan*, 504 U.S. at 561.

third party."[6] *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296 (11th Cir. 2019) (*en banc*); *see also Clapper*, 568 U.S. at 411 (holding that speculation about whether Plaintiffs would be subjected to surveillance under the challenged federal statute, "or some other authority—shows that [Plaintiffs] cannot satisfy the requirement that any injury in fact must be fairly traceable to" the challenged statute). Here, as in *Carter*, Plaintiffs' injury, to the extent they have one, flows from their current and temporary inability to get a GWL. That circumstance cannot be traced to either Governor Kemp or Colonel Vowell.[7] Plaintiffs seek an Order enjoining the State Defendants from enforcement of O.C.G.A. § 16-11-126, "[b]ut what, exactly, do they say the [State Defendants] did wrong – how, exactly, do they trace their injuries to [their] 'conduct?'" *Lewis*, 944 F.3d at 1296. Without a connection between Plaintiffs' alleged injuries and the State Defendants' conduct, Plaintiffs lack standing to bring claims against the State Defendants. *See also Allen v. Wright*, 468 U.S. 737, 752-753 (1984) (holding that parents of school children did not have standing to challenge federal tax exemptions to racially discriminatory private schools because the alleged injury was not "fairly traceable

---

[6] While Plaintiffs' Complaint is not clear, it does not appear that Plaintiffs are bringing a facial challenge to O.C.A. §16-11-126. Both the Complaint and Plaintiffs' Motion suggest a claim premised on Plaintiffs' current inability to secure a GWL. (*See* Doc. 1, ¶¶ 31, 32, 41, 47 and especially 48; Doc. 2-1, pp. 2, 5, 20-21, 23).

[7] Nothing in the Governor's Executive Order expressly addresses the issuance of Georgia weapons permits.

to the assertedly unlawful conduct of the IRS."). Plaintiffs' claims against the State Defendants do not support a TRO or preliminary injunction.

### 2. Plaintiffs, FPC and SAF, Have Not Established Standing.

As organizational plaintiffs, FPC and SAF may make the three-pronged showing under two alternative theories: (1) the "diversion-of-resources theory" in which the organizational plaintiff asserts standing on its own behalf by alleging facts showing that the defendants' allegedly "illegal acts impaired the organization's ability to engage in its own projects by forcing the organization to divert resources in response"; or (2) the "associational theory" in which the organizational plaintiff asserts standing in a representational capacity for its members where "the members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Arcia v. Sec'y of Florida*, 772 F.3d 1335, 1341-1342 (11th Cir. 2014). *See also Greater Birmingham Ministries v. Merrill,* 250 F. Supp. 3d 1238, 1242 (N. Dist. Ala. 2017) (describing these theories as "distinct, alternative theories for organizational standing"). Plaintiffs rely on both a "diversion of resources" theory and "associational theory" to prove standing. (Doc. 1, ¶¶ 5, 6; Doc. 2-1, pp. 5-6; Doc. 2-2, ¶¶ 19, 20; Doc. 2-4, ¶¶ 10, 11).

### a. Diversion of Resources Theory

In *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1982), the Supreme Court established the principle that an organization's diversion of resources in response to a defendant's allegedly illegal conduct could constitute "injury in fact" for purposes of demonstrating standing. That case considered whether a nonprofit housing organization had standing to sue an apartment complex for alleged violations of the Fair Housing Act. In holding that the group had standing, the Court concluded that the defendants' racial steering practices had "perceptibly impaired [plaintiff's] ability to provide counseling and referring services for low and moderate-income home-seekers," thus resulting in a concrete injury-in-fact to the organization. *Havens Realty*, 455 U.S. at 379. The Court, however, made clear that it was necessary to allege a "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources" – and that "a setback to the organization's abstract social interests" was *not* to sufficient to demonstrate an injury in fact for purposes of standing. *Id.*

Since *Havens*, federal courts addressing organizational standing have examined whether the lawsuit alleges that the defendant's conduct resulted in actual or imminent harm to the organization by forcing it to divert resources from other projects and interfering with its normal daily activities. "An organization's ability to provide services has been perceptibly impaired when the defendant's

conduct causes an inhibition of the organization's daily operations." *Food & Water Watch*, 808 F.3d at 919. The courts have been clear that a "conflict between a defendant's conduct and [an] organization's mission is alone insufficient to establish Article III standing." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996). *See also Clark v. Burger King*, 255 F. Supp.2d 334, 344 (D. N.J. 2003) ("an organization does not possess standing simply because it has an ideological or abstract social interest that is adversely affected by the challenged action.")

Costs associated with litigation, including identifying witnesses and potential violations, are *not* injuries for purposes of conferring standing because they do not involve harm to the daily operations of the entity: "[P]laintiffs cannot bootstrap the cost of detecting and challenging the illegal practices into injury for standing purposes." *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).

Two "key factors" in determining whether an organizational plaintiff has demonstrated standing under a diversion of resources theory is "whether the injury relates to the organization's mere advocacy objectives," which is insufficient to confer standing, or "if instead, it undermines the organization's direct, non-advocacy services," which would demonstrate injury-in-fact. *Int'l Acad. Of Oral Medicine & Toxicology,* 195 F. Supp. 3d 243, 256 (D.D.C. 2016). "Another

[key factor] is whether the organization truly 'diverted' any resources at all; in other words did the challenged agency action cause it to incur 'operational costs beyond those normally expended' to carry out its day-to-day mission of educating the public or advancing its advocacy mission." *Id.*

Here, Plaintiffs' motion relies upon Declarations from Brandon Combs (Doc. 2-2), President of Plaintiff FPC, and Alan Gottlieb (Doc. 2-4), Executive Vice President of Plaintiff SAF, to demonstrate standing. The Declarations contain only one identical vague allegation that their organization:

> has and continues to expend and divert resources, and has been and continues to be adversely and directly harmed, because of Defendants' laws and orders, and their enforcement policies, orders, practices, customs, and actions challenged herein.

(Doc. 2-2, ¶ 20; Doc. 2-4, ¶ 11). The Declarations contain no other allegations to support a diversion of resources theory of standing.

These allegations are insufficient in several respects. First, they provide absolutely no information as to how Plaintiffs' day-to-day operations were in fact impacted by this alleged diversion of resources.[8] Second, there are no allegations that the areas where resources were allegedly diverted to were not in fact already

---

[8] Organizational plaintiffs relying upon a diversion of resources theory must identify specific projects that were either put on hold or curtailed as a result of the diversion of resources necessitated by the defendant's conduct. *City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010); *Browning*, 522 F.3d at 1166.

part of the Plaintiffs' normal operations.[9]  Third, there are no allegations of specific

adverse effects on pre-litigation normal operations.[10]  For these reasons, Plaintiffs

have failed to demonstrate an injury-in-fact through a diversion of resources

theory.

Finally, even if Plaintiffs had adequately demonstrated a diversion of

resources, Plaintiffs still have not alleged standing because the diversion of

resources for an underlying harm that is speculative and uncertain, i.e., that their

members and others like them will be arrested and prosecuted for carrying a

weapon without a Georgia weapons carry license, is insufficient to establish

standing.

In *Clapper* the Supreme Court made clear that a plaintiff cannot claim harm

for purposes of standing based on costs incurred "as a reasonable reaction to a risk

of harm" when the harm "is not certainly impending." "In other words, [plaintiffs]

---

[9] In order to qualify as an injury-in-fact, the organization's expenditures must be for "operational costs beyond those normally expended." *Food & Water Watch*, 808 F.3d at 920.  *See also City of Kyle*, 626 F.3d at 238; *PETA v. United States Dep't of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)

[10] "An organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *PETA*, 797 F.3d at 1093.  *See also Nat'l Consumers League v. General Mills*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) (declining to find Article III standing where the organization plaintiff "has merely chosen to devote its resources to challenge [defendant's] conduct by filing this suit, much like 'the self-inflicted harm' of challenging a regulation.")

cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.*

### b. Associational Standing Theory.

Plaintiffs FPC and SAF also assert standing by way of an "associational" standing theory. Organizations may assert "associational" or "representational" standing to enforce the rights of its members where "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sierra Club v. TVA*, 430 F.3d 1337, 1344 (11th Cir. 2005) (quoting *Friends of the Earth v. Laidlaw Environ. Servs.*, 528 U.S. 167, 181 (2000)); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009); *Amnesty Int'l. v. Battle*, 559 F.3d 1170, 1178 (11th Cir. 2009). Here, FPC and SAF fail on the first prong. As demonstrated above, Plaintiff Walters, and other FPC and SAF members, do not have standing to sue because they have no concrete injury in fact. For this reason, FPC and SAF cannot establish standing premised on an associational theory of standing.

### B. Plaintiffs' Claims Against the State Defendants are Barred by the Eleventh Amendment.

The Eleventh Amendment bars suit against a State's agencies, departments, or officials, absent a waiver by the State or a valid congressional override, when the State is the real party in interest or when any monetary recovery would be paid from State funds. *Kentucky v. Graham*, 473 U.S. 159, 1653 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). Because claims against public officials in their official capacities are merely another way of pleading an action against the entity of which the officer is an agent, "official capacity" claims against a state officer are included in the Eleventh Amendment's bar. *Kentucky*, 473 U.S. at 165.

An exception to Eleventh Amendment immunity exists under *Ex parte Young*, 209 U.S. 123 (1908), for suits against state officers for prospective injunctive relief. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n. 24 (1997). However, "[i]n making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000) (quoting *Ex parte*

*Young*, 209 U.S. at 157 and declining to apply the exception where Defendants had no authority to enforce the challenged statutory provision). "Under *Ex Parte Young*, a litigant must bring his case 'against the state officer or agency responsible for enforcing the allegedly unconstitutional scheme." *Osterback v. Scott*, 782 Fed. Appx. 856, 858-859 (11th Cir. 2019) (quoting *ACLU v. The Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993)). Here, there is no connection between the State Defendants and the decision of a member of the judicial branch to suspend processing weapons licenses.[11]

**C. The State Defendants Have No Control Over the Judiciary.**

To the extent Plaintiffs seek to hold the State Defendants liable for the alleged failure of the County Defendants to accept new GWL applications,

---

[11] Although Plaintiffs' complaint asserts only federal constitutional claims, as this Court recognized in *Carter*, any claims premised on an alleged violation of state law are also arguably barred by the Eleventh Amendment under *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). *Carter*, No. 1:20-CV-1517-SCJ, Order on Motion for Temporary Restraining Order at 20-21 n. 11. *See also Doe v. Bush*, 261 F.3d 1037, 1055 (11th Cir. 2001) (explaining that "federal courts do not have the authority to compel state actors to comply with state law."); *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1205 (11th Cir. 2010) (First Amendment claim barred where "gravamen of the complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute"); *DeKalb Cty. Sch. Dist. V. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997) (holding claims barred where "gravamen of its complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute governing reimbursement for transportation costs."). Similarly, here, the gravamen of Plaintiffs' complaint is they cannot currently obtain a license, as both required and provided for by state law.

Plaintiffs cannot state a claim as a matter of law. Any claims premised on the judicial emergency declaration and decision of the County Defendants to stop processing GWL applications during the state of emergency fail to state a claim against the State Defendants since they do not exercise control over the judiciary or otherwise direct the judiciary's decision-making or court operations. To do so would violate the separation of powers mandated by Georgia's Constitution:

> The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided.

Ga. Const. Art. I, Section II, Para. III.[12] This doctrine of separation of powers "invests those officials charged with the duty of administering justice according to law with all necessary authority to efficiently and completely discharge those duties the performance of which is by the constitution committed to the judiciary, and to maintain the dignity and independence of the courts." *Lovett v. Sandersville R.R.*, 199 Ga. 238, 239-240 (1945); *see also Cormier v. Horkan*, 2010 U.S. Dist. LEXIS 12146, at *22-23 (M.D. Ga. 2010) (rejecting claim that Governor had supervisory authority over judiciary as a matter of law) (vacated and remanded on other grounds). The State Defendants cannot be held liable for conduct over which

---

[12] Under the Georgia Constitution, the General Assembly has express authority to "prescribe the manner in which arms may be borne." Ga. Const. Art. I, Section I, Para. VIII. The General Assembly established a framework and tasked the probate courts with issuing licenses as set forth in O.C.G.A. § 16-11-129.

they have no control or authority; therefore, any claim against them based on the failure of the County Defendants to process GWL applications must be dismissed.

**D. Plaintiffs' Second Amendment Claim is Not Likely To Succeed On Its Merits.**

Because the Plaintiffs' claims are likely to fail on the threshold grounds outlined above, the Court need not address the merits of their Second Amendment arguments. But in any event, those arguments are not likely to succeed. The State Defendants have no control over probate-court operations, and the County Defendants need only show a "real or substantial relation" between the temporary suspension of licensure and the COVID-19 health emergency. Plaintiffs have not clearly raised a facial challenge to Georgia's carry-license requirement, but in any event, that challenge too is not likely to succeed under any of the analyses courts have applied to such challenges.

**1. Plaintiffs' As-applied Challenge Will Fail If the County Defendants Can Show a "Real or Substantial Relation" Between the Temporary Suspension and Efforts to Fight COVID-19.**

Plaintiffs' as-applied challenge focuses on Cherokee County's decision to temporarily cease issuing GWLs because of the COVID-19 pandemic. As just explained, neither Governor Kemp nor Colonel Vowell have any authority or control over Cherokee County court operations. *See infra* at 23–24; *Carter*, No. 20-cv-1517, Order on Motion for Temporary Restraining Order at 13–15.

Moreover, Plaintiffs do not identify any act by the State Defendants that has caused them harm. Rather, they challenge an exercise of judicial authority: the probate court council's decision. For those reasons, if this as-applied challenge is brought against the State Defendants, it necessarily fails.

Given the State Defendants' utter lack of involvement in or control over the probate court council's decision not to issue GWLs during this public health emergency, they are not in a position to provide evidence or argument in defense of that particular decision. That said, as a general matter, that decision should be analyzed under the framework set out in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), which addresses restrictions on individual rights imposed to protect the public's health during a public health crisis. As the Fifth Circuit recently explained in applying *Jacobson*, "individual rights secured by the Constitution do not disappear during a public health crisis," *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *6 (5th Cir. Apr. 7, 2020), but the constitutional analysis is necessarily shaped by the "necessities" of the "particular circumstances" that government actors currently face. *Jacobson*, 197 U.S. at 28. Specifically, under *Jacobsen*, the decision to temporarily suspend issuing GWL permits is constitutional if it can be shown that it bears a "real or substantial relation" to protecting the public during this public health emergency. *Id.* at 31. And while "pretextual," "arbitrary," or "oppressive" measures should be struck

down, "courts may not [otherwise] second-guess the wisdom or efficacy of the measures." *In re Abbott*, 2020 WL 1685929, at \*7.

The county may well be able to meet *Jacobsen*'s test. State and local governments have a compelling interest in combating the spread of COVID-19. *See Jacobson*, 197 U.S. at 27 ("Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."); *Simpson v. Shepard (U.S. Reports Title: Minnesota Rate Cases)*, 230 U.S. 352, 406 (1913) ("The power of the state to take steps to prevent the introduction or spread of disease, although interstate and foreign commerce are involved . . . is beyond question."); *In re Abbott*, 2020 WL 1685929, at \*1 (emphasizing "the escalating spread of COVID-19, and the state's critical interest in protecting the public health"). So the County Defendants need only show that the temporary suspension of licensing bears a "real or substantial relation" to efforts to fight COVID-19. *Jacobson*, 197 U.S. at 28. On that point, the State Defendants note that the licensing process requires in-person fingerprinting, § 16-11-129(c), and that no license is needed to carry a firearm during the large majority of activities permitted by the stay-at-home order which Georgia is currently under. *See* Georgia Exec. Order 04.02.20.02 (April 2, 2020), https://gov.georgia.gov/document/2020-executive-order/04022001/download.

Moreover, Plaintiffs safety concerns are addressed by the fact that defense of self or others is an absolute defense to the GWL requirement. O.C.G.A. § 16-11-138.

### 2. Plaintiffs Do Not Appear to Have Raised a Facial Challenge to Georgia's Carry-License Requirement, But in Any Event, Such a Challenge Is Not Likely to Succeed on the Merits.

It is not entirely clear whether Plaintiffs' complaint or application for a TRO also raises a facial challenge to Georgia's carry-license requirements (in addition to their as-applied challenge focused on Cherokee County's decision to temporarily suspend licensure). On balance, the State Defendants do not construe these papers as raising such a challenge, particularly given their consistent references to the County Defendants' decision to temporarily suspend issuing licenses as the root cause of their inability to carry a handgun in public. (*See, e.g.*, Doc. 2-1 at 1–2, 4, 5). Their repeated characterization of the license requirement as a "total ban" that "completely prohibits" law-abiding adults from carrying handguns would seem to confirm that they do not mean to challenge the law on its face, since Georgia's lenient, "shall . . . issue" carry-license regime on its own cannot plausibly be understood as a "total ban" on carrying handguns in public. O.C.G.A. § 16-11-129(a)(1). But even construing their papers as raising a facial challenge to this law, it, too, would be unlikely to succeed on its merits.

a. Plaintiffs primarily argue that the GWL requirement is a "[c]ategorical ban" on handgun possession that is therefore "absolutely unconstitutional" with

"no tiered scrutiny analysis" required. (Doc. 2-1 at 11). The Eleventh Circuit has not yet adopted this particular analysis, *see GeorgiaCarry.Org*, 788 F.3d at 1325 (rejecting "swing for the fences" argument that U.S. Army Corps of Engineers firearms regulation was "unconstitutional *per se*" without deciding that such analysis was appropriate), but their argument under it fails anyway.

The State Defendants do not dispute that a law violates the Second Amendment if it in fact destroys the "general right to keep and bear arms in self-defense." *GeorgiaCarry.Org*, 788 F.3d at 1325–26 (rejecting the argument that a firearms ban on U.S. Army Corps of Engineers property "completely destroyed" the right to bear firearms) (citing *D.C. v. Heller*, 554 U.S. 570, 575 (2008) (reviewing a categorical prohibition on handgun possession, including within one's home); *Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1147 (9th Cir. 2014), *reversed on reh'g en banc*, 824 F.3d 919 (9th Cir. 2016) (considering a licensing regime that categorically prohibited individuals from carrying firearms outside the home unless they could document threats against them)).

But, to put it mildly, Georgia's carry-license statute is not a "total ban" on firearm possession. As an initial matter, Georgia law requires a GWL only in limited circumstances. The requirement does not apply "inside [one's] home, motor vehicle, or place of business." O.C.G.A. § 16-11-126(a). Nor does it apply to long guns "carried in an open and fully exposed manner," *id.* at § 16-11-126(b), or

handguns that are "enclosed in a case and unloaded." *Id.* at § 16-11-126(c). "Any person with a valid hunting or fishing license" may carry a firearm without a license while engaged in hunting, fishing, or sport shooting. *Id.* at § 16-11-126(f)(1). Various public servants are exempted from the license requirement. O.C.G.A. § 16-11-130(a). And defense of self or others is an absolute defense to the GWL requirement. O.C.G.A. § 16-11-138.

More to the point, nor does the statute even come close to banning the carry of handguns in public for self defense. To the contrary, the statute ensures—at least in normal times—that all law-abiding adults who wish to carry a handgun in public will be able to do so without difficulty or delay. Georgia is a "shall issue" state: Georgia probate courts "shall . . . issue" GWLs to all individuals who complete an application and pass the background check. O.C.G.A. § 16-11-129(a)(1). So unlike in *Heller*, where the District of Columbia had enacted a blanket prohibition on unregistered firearms and provided no way to register one, 554 U.S. at 574, Georgia law *requires* probate courts to issue licenses. And unlike in *Peruta*, where the sheriff's department had unbridled discretion to determine whether the applicant had shown good cause for a license, 742 F.3d at 1148, Georgia law gives probate courts no discretion in issuing licenses. *See Ferguson v. Perry*, 292 Ga. 666, 666 (2013); Op. Atty. Gen. No. U89-21, Aug. 25, 1989.

Further, the statutory bases for denying a GWL are extraordinarily narrow. A probate court may deny a license only if the applicant (1) is under 21 years old, (2) has been convicted of or is being prosecuted for some kind of criminal wrongdoing, or (3) has been an inpatient at a mental facility (or addiction treatment center) or judged mentally incompetent. *Id.* at 16-11-129(b)(2). And Georgia law further requires that the probate court issue the license, if the applicant is entitled to one, within 35 days of the application. *Id.* at 16-11-129(d) (explaining that the court must refer the applicant for fingerprint and background checks within 5 days, that law enforcement must return their report within 20 days, and the court must issue the license within 10 days of receiving those reports).

In short, the license requirement that Plaintiffs challenge applies narrowly, and when it does, probate courts "shall" issue licenses to qualified applicants, and the statutory bases for denying licenses are few and narrow. That is not a categorical ban on firearm possession, and so it is not "categorically unconstitutional."

**b.** Although Plaintiffs contend that no scrutiny-based analysis should be applied, they also argue in the alternative that the "carry ban" "cannot survive any level of heightened scrutiny." (Doc. 2-1 at 14–15). Assuming again for purposes of this argument that, by "carry ban," they mean the carry-license requirement on its face—rather than the license requirement as applied in Cherokee County with

31

the temporary suspension of licenses—they are not likely to succeed on that argument. Even assuming strict scrutiny applies, the carry-license requirement is likely to satisfy it.[13]

Strict scrutiny requires that the government "demonstrate that the policy serves a compelling interest and that it has been narrowly tailored to further that interest." *Ray v. Comm'r, Alabama Dep't of Corr.*, 915 F.3d 689, 698 (11th Cir. 2019). O.C.G.A. § 16-11-129 satisfies that standard. The license requirement furthers the compelling public interest of protecting society by prohibiting law breakers (and others that have shown their unsuitability) from possessing firearms. And the impact on Second Amendment rights is minimal: licenses are required only in limited circumstances, and qualified individuals are guaranteed quick and easy licensure. *See Hertz v. Bennett*, 294 Ga. 62 (2013) (holding that O.C.G.A. § 16-11-129 does not violate the right to bear arms under either the federal and Georgia constitutions).

---

[13] As Plaintiffs acknowledge, neither the Supreme Court nor the Eleventh Circuit have "definitely resolved the standard for evaluating Second Amendment claims." *Silvester v. Becerra*, 138 S. Ct. 945, 947–48 (2018) (Thomas, J., dissenting from denial of certiorari); *see also GeorgiaCarry.Org*, 788 F.3d at 1328. But this Court need not resolve that standard here, and certainly not in the context of resolving plaintiffs' request for expedited, preliminary relief. The State Defendants assume strict scrutiny here only to respond to Plaintiffs' alternative argument and without taking a position on the proper standard for evaluating Second Amendment claims as a general matter.

Georgia has a compelling interest in protecting the community from crime, especially in public places. *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."). *See also United States v. Salerno*, 481 U.S. 739, 745 (1987) (same). Section 16-11-129 furthers that compelling government by "keep[ing] guns out of the hands of those individuals who by their prior conduct ha[ve] demonstrated that they may not possess a firearm without being a threat to society." *Landers v. State*, 250 Ga. 501, 503 (1983). *See also Hertz v. Bennett*, 294 Ga. 62, 67 (2013) (explaining that § 16-11-129 is meant to "protect the safety of individuals who are in public places"). And Plaintiffs do not question any of these interests.[14] Rather, they argue that the licensing requirement is not a narrowly tailored way to achieve those goals. (Doc. 2-1 at 18–22).

The Supreme Court and Eleventh Circuit, however, have both expressly found that a state may constitutionally prohibit criminals and wrongdoers from possessing firearms. *Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (citing *Heller* for the proposition that "statutes disqualifying felons from

---

[14] In fact, Walters alleges that she is a law-abiding adult who is entitled to a license. (Doc. 1, ¶¶ 4, 27). So Plaintiffs lack standing to challenge the statutory restrictions on who can obtain a license.

possessing a firearm under any and all circumstances do not offend the Second Amendment"); *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010) (confirming that *Heller's* rationale also applies to statutes that prohibit possession of firearms by those convicted of misdemeanors).

*Heller* and *Rozier* confirm the statute's constitutionality. If Georgia could constitutionally prohibit wrongdoers and the mentally ill from possessing firearms in all circumstances, it can certainly do so in the limited circumstances identified in § 16-11-129.

Georgia has taken care to ensure that dangerous individuals cannot possess weapons while ensuring speedy licensure of all others. First, the license requirement does not apply to situations when the risk to the public is lowered. Georgia residents do not need a license to possess a firearm "inside [one's] home, motor vehicle, or place of business." O.C.G.A. § 16-11-126(a). Likewise, no license is required to carry a long gun "in an open and fully exposed manner," *id.* at § 16-11-126(b), or a handgun "enclosed in a case and unloaded," *id.* at § 16-11-126(c), circumstances in which the danger of a deadly incident is reduced. Moreover, outdoorsmen and women may hunt, fish, and shoot clay pigeons without worrying about licensure. *Id.* at § 16-11-126(f)(1). Indeed, the rarity of arrests for possession without a license underscore that the State has gone out of its way to limit the restrictions upon Second-Amendment-protected activities.

34

Langford Decl. at 4; O.C.G.A. § 16-11-137 (prohibiting law enforcement from detaining a person solely to check for a valid weapons carry license).

Second, for those individuals who need a license, Georgia law mandates that probate courts "shall . . . issue" a GWL quickly: within 35 days of an application from a qualified individual, just time enough to fingerprint the applicant and conduct the necessary background checks. §§ 16-11-129(a)(1), (d).

Third, the list of public employees exempted from the license requirement, § 16-11-130(a), reflects careful tailoring by the legislature. The exceptions in § 16-11-130(a) further the legislature's overall interest in ensuring public safety. The list is comprised of government employees, all of whom are either involved in law enforcement or judicial proceedings in some capacity. *Id.* Some must carry weapons as part of their job. *Id.* at (1), (2), (3), (4), (7), (11), (16). Others serve in positions that make them targets. *Id.* at (5), (6), (12), (13), (15). And each of these employees work in a position of public trust. On information and belief, most of these public servants—if not all—must undergo background tests before taking the job. The legislature's judgment that serving in one of these roles is prima facie evidence that the individual is *not* a threat to society (and in fact might increase public safety by carrying a handgun) was reasonable.

Thus, even assuming Plaintiffs have raised a facial challenge to § 16-11-129, and that strict scrutiny applies, it is likely to fail.

## II. Plaintiffs Have Not Shown Any Non-speculative Irreparable Injury.

In addition, Plaintiffs cannot show that they will suffer an irreparable injury in the absence of the relief requested. "[A] showing of irreparable injury is the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). It cannot be presumed, even where there is a violation of constitutional rights. *Id*. at 1177-78 ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however."). A movant for a preliminary injunction must present facts that show a "real and immediate" threat of substantial, irreparable harm before a federal court will intervene. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (explaining that "[t]he injury or threat of injury must be both real and immediate, not conjectural or hypothetical"); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994).

Plaintiffs do not face any threat of irreparable harm. Georgia law prohibits law enforcement officers from detaining a person for the purpose of seeing if he or she has a GWL. *See* O.C.G.A. § 16-11-137(b). Georgia law also provides an "absolute defense" for any violation of O.C.G.A. § 16-11-126 if acting in self-defense. *See* O.C.G.A. § 16-11-138. In other words, Plaintiffs Walters and

other members of Plaintiff organizations will not suffer irreparable harm since they do not possess a credible fear of prosecution.

Because Plaintiffs have failed to demonstrate any immediate threat of irreparable injury, their Motion should be denied.

## III.    The Damages of the Proposed Injunction Outweigh Any Risk of Injury to Plaintiffs and an Injunction Would be Adverse to the Public Interest.

Plaintiffs bear the burden of showing that the perceived injury outweighs the damages that the injunction might cause. *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988). They have not met this burden because their alleged injury is the threat of prosecution for carrying a handgun without a GWL. However, as explained above, they have not demonstrated a credible threat of prosecution. Under these circumstances, Plaintiffs' Motion should be denied.

## CONCLUSION

Because Plaintiffs cannot establish that they are entitled to injunctive relief against Governor Kemp and Colonel Vowell, their Motion for Temporary Restraining Order or Preliminary Injunction should be denied.

Respectfully submitted this 24th day of April, 2020.

CHRISTOPHER M. CARR        112505
Attorney General

ANDREW A. PINSON        584719
Solicitor General

BETH BURTON                 027500
Deputy Attorney General

*/s/ Tina M. Piper*
TINA M. PIPER               142469
Sr. Assistant Attorney General

*/s/ Cristina M. Correia*
CRISTINA M. CORREIA      188620
Sr. Assistant Attorney General

*/s/ Meghan R. Davidson*
MEGHAN R. DAVIDSON      445566
Assistant Attorney General

DREW F. WALDBESER
Assistant Solicitor General


40 Capitol Square, S.W.
Atlanta, Georgia  30334-1300
Direct line: (404) 657-3983
Fax: (404) 463-8864
Email: tpiper@law.ga.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendant's Response to Plaintiffs' Motion for Preliminary Injunction were prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed **RESPONSE OF GOVERNOR KEMP AND COLONEL VOWELL TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of the attorneys of record.

This 24th day of April, 2020.

/s/ Meghan R. Davidson
MEGHAN R. DAVIDSON
Assistant Attorney General