**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

LISA WALTERS, et al.,          )
     Plaintiffs,           )
vs.                          )
BRIAN KEMP, et al.,           )
     Defendants.          )     Case No. 1:20-CV-1624-SCJ

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF THEIR REQUEST FOR THE
ISSUANCE OF A PRELIMINARY INJUNCTION**

## I.     INTRODUCTION

Winnowed down to their nub, the Defendants' claims all collapse into two essential propositions. First, they say, no "credible" threat of injury exists to Plaintiffs, or anyone else similarly situated, from the current total freeze on the acceptance and processing of GWL applications in Cherokee County. This proposition forms the basis of all their claims going to the nature and extent of the constitutional injury involved – *i.e.*, that there is no "injury in fact" for standing, there is no "irreparable harm," the balance of equities and public interests weigh in their favor, and there is no "likelihood of success" on the merits of Plaintiffs' action. Second, Defendants say that even if a credible threat of injury exists – and indeed even if an injury has already occurred – none of them can or should be held

responsible because the buck stops somewhere else with somebody else, although no one really knows, or cares, where or with whom the responsibility ultimately rests.  Such a round-robin avoidance of responsibility for forcing Plaintiffs and others to choose between forfeiting their constitutional right to carry a handgun or committing a crime simply cannot be countenanced.  Between the Governor and the Judge the Hobson's choice can be resolved either by processing legitimate license applications necessary to save the constitutionality of the license requirement or by suspending the penalties for carrying without a license for the period in which such permits are unavailable. Plaintiffs have carried all their burdens, they are entitled to relief, and this Court has all the jurisdiction and power it needs to grant them relief.

## II.    ARGUMENT

### A.    The Undeniable "Credible" Threat

On the point so critical to the full spectrum of the Defendants' arguments, the standard for establishing a "credible threat of prosecution" is "quite forgiving," as the Eleventh Circuit reminded us just days ago. *Robinson v. Attorney General*, ___ F.3d ___, 2020 WL 1952370 (11th Cir. April 3, 2020), *3. So forgiving, in fact, that in *Robinson* it was ultimately enough that the single individual plaintiff was "concerned" she would be "subject to misdemeanor charges" if she violated the Governor's orders imposing restraints upon the performance of abortion procedures

during the current pandemic, notwithstanding the State's assurances they would apply a lenient standard. *Id.* at *3 ("Dr. Robinson testified that she is concerned that if she violates the April 3 order, she will be subject to misdemeanor charges.").

The *Robinson* court also reiterated the important principle that "'[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Robinson*, 2020 WL 1952370 at *3 (quoting *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cty.*, 221 F.3d 1211, 1214 (11th Cir. 2000).

Plaintiff Walters and the similarly situated class she represents have indeed alleged a "reasonable and imminent fear and risk of arrest and criminal prosecution" for carrying a loaded handgun anywhere outside her homes, cars, and workplaces because O.C.G.A. § 16-11-126(h) proscribes doing so on pain of criminal penalty without the license they are barred from obtaining due to the current freeze on all acceptance and processing of any new GWL applications in Cherokee County. *See e.g.,* Complaint, ¶¶ 30, 43. Defendants do not dispute that doing so would indeed be a crime, wholly apart from the odds of her getting *caught* committing such crime.

Yet, the Defendants still say no. Primarily, they claim that there is no risk of arrest or prosecution solely for carrying a loaded handgun without a GWL in

violation of O.C.G.A. § 16-11-126(h) because § 16-11-137(b) prohibits "detention for the sole purpose of investigating whether such person has a weapons carry license." However, *detention* has special meaning in criminal law and, under long-established precedent, includes only circumstances where a law enforcement officer has restrained a person's liberty "by means of physical force or show of authority" such that he or she is not free to leave. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). By contrast, "mere police questioning does not constitute a seizure." *Id.* Officers are free to "approach[] an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Id.* Thus, there is nothing to prohibit any law enforcement officer in Georgia from initiating a *consensual* encounter with anyone, asking about the person's licensure status, and using any voluntary answers as evidence to support arrest, charging, or prosecution under § 16-11-126(h). Moreover, if police lawfully detain a person for some ***other*** purpose, they are then free to use that detention to ask if the person has a license.  And the standards for such investigatory detentions are notoriously lenient, with police having considerable leeway to stop anyone they might deem suspicious for a wide range of reasons, both genuine and contrived.

This is no different from the current situation nationwide with driver's licenses. An officer is prohibited from pulling over a motorist for the sole purpose of inquiring if the motorist has a driver's license. *Delaware v. Prouse,* 440 U.S. 648 (1979). But the same officer may stop a motorist based on reasonable articulable suspicion that the motorist has committed a traffic infraction, and once detained, the officer may demand to see a driver's license.

While the Defendants' papers point to the declaration of Sergeant Gary Langford with the Georgia State Patrol that police officers at the *state* level are instructed not to initiate investigative contacts with citizens for the sole purpose of determining their compliance with the weapons licensing laws, that speaks only to the practices and policies of those officers and says nothing of the law enforcement agencies at the county and city level, or even other state-level officers such as agents of the Georgia Bureau of Investigation. They are not bound to these directives and, according to the language of the statute itself, are otherwise free to initiate consensual encounters designed to investigate such licensing violations without actually *detaining* anyone. What little protection that does exist against investigatory stops for the "sole" purpose of asking about firearms licenses under O.C.G.A. § 16-11-137(b) is inherently superficial anyway, because once a detention does occur based on reasonable articulable suspicion of *any* other crime, anything goes and

there is no bar whatsoever to prosecution for any violation of the license requirement.

Similarly, the Defendants' emphasis upon the evidence that the *state* law enforcement officers have issued 14 citations for violating O.C.G.A. § 16-11-126(h) over the last two years and each time in connection with other criminal offenses, cannot somehow dispel the credible threat of prosecution. At the end of the day, their own evidence shows this statute *is* actually being enforced. Beyond that, they ignore the reality that the statute is undoubtedly being enforced by the numerous other law enforcement agencies across the state at the county and city level. In fact, over the last ten years, prosecutions under O.C.G.A. § 16-11-126(h) (or its predecessor, former § 16-11-128) have led to at least ten reported appellate decisions out of nine different counties. *See e.g., Watkins v. State*, 304 Ga.App. 78, 695 S.E.2d 394 (2010) (Floyd County); *Skinner v. State*, 318 Ga.App. 217, 733 S.E.2d 506 (2012) (Dougherty County); *In the Interest of D.M., a Child*, 307 Ga.App. 751, 706 S.E.2d 683 (2011) (DeKalb County); *Moore v. State*, 649 S.E.2d 337, 286 Ga.App. 313 (2007) (Butts County); *Felder v. State*, 662 S.E.2d 826, 291 Ga.App.740 (2008) (Crisp County); *State v. Carrion*, 327 Ga.App. 296, 758 S.E.2d 632 (2014) (Clayton County); *Johnson v. State* (Ga. 2020), ___ Ga ___, ___ S.E.2d ___, 2020 WL 966592 (Bibb County); *Davis v. State*, 347 Ga.App. 757, 820 S.E.2d 791 (2018) (Muscogee County); *Malphurs v. State*, 336 Ga.App. 867, 785 S.E.2d 414 (2016) (Clayton

County); *Amos v. State*, 783 S.E.2d 900, 298 Ga. 804 (2016) (Fulton County).  Given that published appellate decisions inevitably are the proverbial tip of the iceberg for criminal matters, one can reasonably fear that the law is being enforced in many more instances that result in a plea or an un-appealed conviction.

The second (half-hearted) argument from the Defendants on this point is that O.C.G.A. § 16-11-138 provides an "absolute defense" to a violation of 16-11-126(h) when a handgun is used in "defense of self or others." As the Georgia Supreme Court recently confirmed in *Johnson v. State*, __ Ga. __, 839 S.E.2d 521 (2020), this statute applies only to the *use* of a handgun during that *fleeting moment* of fending off an attack and then only if the use satisfies the stringent requirements of "self-defense" to excuse criminal liability for a violent crime – *i.e.*, the person's belief in the need to use deadly force was objectively reasonable and the defendant used no more force than necessary to fend off the attack. *Johnson* at 525, n. 7 ("[W]hen applied to, for instance, the possession of a firearm by a convicted felon or felony first-offender probationer, it would justify the possession only for the duration of the necessity. If a felon or probationer came into possession of a firearm prior to any necessity arising and continued to have possession after any necessity had dissipated, his possession both before and after the time of necessity would be felonious and prosecutable."). And the person remains criminally liable for every moment of carrying a loaded handgun without a GWL before and after the fleeting moment of such "self-

defense." The fundamental *civil* constitutional right to "self-defense" under the Second Amendment protects the "'individual right to possess and carry weapons *in case of* confrontation," *U.S. v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017) (italics added) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)), i.e., *in anticipation of* and thus *for* those moments before and after any necessary use, as the mere possession of the handgun may well in itself serve to deter an attack.

The threat of prosecution is more than "credible," it is "real," particularly under the "quite forgiving" standards of the Eleventh Circuit, and especially right now when the statewide shelter-in-place orders necessarily increase the likelihood of contacts with police officers enforcing those orders by approaching citizens out in public areas to investigate their compliance with these orders. Any "detention" on probable cause of violating these orders, and any voluntary answers to "mere questioning" without a seizure, could lead to arrest and prosecution for violating the weapons licensing statute should a person be in possession of a loaded handgun without a GWL, even if the person is entirely eligible to obtain one and is without one only because the ability to obtain a GWL has been eliminated by the Defendants. Plaintiff's fear of such consequences is more than reasonable, she should not be

forced to commit a crime to exercise fundamental rights in any event, and that is more than sufficient to establish a constitutional injury for standing purposes.[1]

## B.   The Palpable "Irreparable Harm"

For the same essential reasons, Plaintiffs have demonstrated "irreparable harm" for purposes of the preliminary injunctive relief they seek. Without the now-unavailable GWLs for which they are otherwise eligible they cannot lawfully carry a loaded handgun anywhere outside their homes, cars, or workplaces. Because Plaintiff Walters, and all those similarly situated to her, are law-abiding citizens who have no intentions of violating the licensing scheme – despite the Defendants' astonishing suggestions that this may somehow be a viable solution for them – they are actively being deprived of their Second Amendment rights. Notably, counsel for the State Defendants agreed at the hearing that the Second Amendment specifically includes among its bundle of rights the right to "carry firearms in self-defense even outside the home" and went on to effectively concede that the constitutionality of the licensing requirement is *dependent upon* the availability of GWLs as the only

---

[1]    For the same reasons, "their threatened injuries are 'certainly impending'" within the meaning of *Jacobson v. Florida Secretary of State*, No. 19-14552 (11th Cir. April 29, 2020). The state Defendants' last-minute rush to cite the *Jacobson* case as somehow significant or determinative in their favor, when it does nothing more than repeat basic standards long settled in the Eleventh Circuit regarding the general question of standing, is simply further testament to their desperate efforts in seeking to find some cover anywhere they believe they can to avoid responsibility.

means to legally exercise that right for law-abiding citizens like Plaintiff Walters who do not fall within an exemption. Tr. At 46:23-25, 47:1-12.

Significant authority establishes this point. *See e.g.*, *U.S. v. Focia*, 869 F.3d at 1285 (quoting *Heller*, 554 U.S. at 592) (the Second Amendment "codified a pre-existing 'individual right to possess and carry weapons in case of confrontation'"); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1322 (11th Circuit 2015) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767-68 (2010)) ("[C]itizens must be permitted to use handguns for the core lawful purpose of self-defense."); *Heller*, at 628 (explaining the many practical reasons why people prefer to exercise their Second Amendment rights with a handgun as the "quintessential weapon" to wear and bear in self-defense, in that they are "readily accessible in an emergency," "cannot easily be redirected or wrestled away by an attacker," "easier to use for those without the upper-body strength to lift and aim a long gun," and "can be pointed at a[n] [attacker] with one hand while the other hand dials the police"); *Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017) ("[P]ossession and carrying—keeping and bearing—are on equal footing."); *id.* at 661 ("[T]he individual right to carry common firearms beyond the home for self-defense—even in densely populated areas, even for those lacking special self-defense needs—falls within the core of the Second Amendment's protections.").

There is a real and ongoing deprivation of a constitutional right, more than enough to demonstrate the "irreparable harm" necessary to warrant injunctive relief. *See GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 38 F.Supp.3d 1365, 1378-79 (N.D. Ga. 2014) (aff'd *GeorgiaCarry.org, Inc.*, 788 F.3d at 1329) ("The Court does not question that a demonstrated violation of certain constitutional rights satisfies the irreparable harm requirement without any further showing.").

## C.   The Balance of Harms and Public Interests Necessarily Weighing Heavily in Plaintiffs' Favor

All this leads into the Defendants' argument that the balance of harms and public interests involved weigh in their favor, because it is based on the same spurious claim that Plaintiffs have suffered and face no real risk of any injury or harm. Significantly, the Defendants' repeated and extensive efforts to paint O.C.G.A. § 16-11-126(h) as of no force or effect – with their arguments suggesting this Court should believe Plaintiffs should feel free to roam about with loaded handguns even if they have no GWL.  That astounding implication, if true, would severely undermine *any* legitimate governmental interest in the law. If people have no "credible" reason to fear that the law will actually be enforced against them and are functionally encouraged to violate the law without consequence, then the State necessarily has *no* use for it, much less an interest sufficiently worthy to justify any deprivation of a fundamental constitutional right.

Indeed, to the extent the State seeks to stake a claim in the law based on some generic interest in protecting the public from those who may use firearms in unlawful ways – which is the only interest the State has proffered – it already has many tools at its disposal specifically designed for this purpose.[2] An array of other existing statutes prohibits possession of firearms by those deemed to pose a danger to society and who use firearms in dangerous or other unlawful ways. *See e.g.*, 18 U.S.C. § 922(g) (federal law banning possession by prohibited persons); O.C.G.A. §§ 16-11-30 et seq. (prohibiting offenses against the public order); 16-11-120 et seq. (prohibiting possession of "dangerous weapons" unless specifically exempt); 16-11-127(b) (prohibiting carry in government buildings, etc.); 16-11-127.1 (prohibiting carry in school safety zones and at school functions); 16-11-127.2 (prohibiting possession in nuclear power facilities); 16-11-130.2 (prohibiting carry in restricted areas of commercial airports); 16-11-131 (prohibiting possession by prohibited persons); 16-11-134 (prohibiting discharge while under the influence). So whatever generic law enforcement interest the State may claim or be able to claim here is of minimal to non-existent consequence and cannot outweigh the truly legitimate

---

[2] That the State defendants rely solely on generic law-enforcement concerns and not on COVID-19 health concerns demonstrates why at least those defendants cannot rely on any purported judicial leniency in reviewing emergency health measures. Only Judge Wood asserts such emergency health interests, and he both misreads the caselaw on the subject and would not be entitled to such leniency in any event as he is not the type of politically accountable actor to whom courts afford even ordinary levels of deference on health matters. *See* discussion *infra* at p. 11.

concerns of Plaintiffs that stem directly from an ongoing constitutionally significant injury.

The primary strategy of the County and Judge Wood here is the same – using these spurious no-harm, no-foul arguments to characterize the impact on Plaintiffs as negligible to non-existent so as to shift all the weight of this balancing in their favor. Beyond that, they just cite the standard package of general public safety concerns regarding in-person contacts during the prevalence of the COVID-19 virus. The trouble is, like so much of the Defendants' strategizing in this case, their attempt to take cover under these generalized concerns is set up against a faulty framework – one that applies the wrong standards and gives them a free pass on the critical requirement that the Defendants prove no effective lesser restrictive alternatives exist. As illustrated in the next section, the Defendants have failed to carry this burden and thus they necessarily cannot hope to show their claimed interests outweigh the heavy concerns of Plaintiff Walters and others like her in obtaining redress for the significant, ongoing deprivation of their right to wear and bear a loaded handgun outside the limited confines of their homes, cars, and workplaces.

**D.    Plaintiffs' Clear Likelihood of Success on the Merits**

In evaluating "a likelihood of success on the merits," employing the proper framework for the analysis is essential because this is generally "the most important factor when considering whether to grant a preliminary injunction motion." *Siegel*

*v. LePore,* 234 F.3d 1163 (11th Cir. 2000) (Irreparable harm is the *sine qua non* of injunctive relief); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1349 (N.D. Ga. 2016). Defendants reach for the framework of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), arguing this is the accurate model for the analysis because the case also involved government-imposed restraints on individual liberties in response to an infectious disease crisis. But *Jacobson* is not the right matrix and, even if it comes into play, the result is the same as Plaintiff Walters and those she represents remain equally likely to succeed.

### 1.   The Proper Analytical Framework is *Heller-McDonald*

*Jacobson* is arcane to any modern conception of constitutional jurisprudence concerning individual liberties, having been decided based on an inchoate, non-enumerated liberty interest – "the inherent right of every freeman to care for his own body and health in such way as to him seems best" – long before any of the decisional law that has shaped the nature and contours of the individual rights grounded in the general liberty interest that the *Jacobson* court cited. *Jacobson*, 197 U.S. at 25. It effectively applies what would now be understood as a rational basis test applicable to liberty interests not specifically protected by other provisions of the Constitution. But it is beyond dispute that under modern jurisprudence, such lenient treatment does not apply to infringements of specifically enumerated constitutional rights such as contained in the First or Second Amendments.

For this reason, the United States District Court for the District of Kansas recently held that *Jacobson* "d[id] not provide the best framework in which to evaluate the Governor's executive orders" restricting First Amendment free exercise rights in response to the COVID-19 pandemic, and the court instead applied the modern-day jurisprudence on free exercise rights as the proper framework for reviewing the orders' constitutionality. *First Baptist Church v. Kelly*, ___ F.3d.Supp. ___, 2020 WL 1910021, *6 (D. Kan. 2020). Indeed, in the recent Eleventh Circuit case of *Robinson v. Attorney General*, ___ F.3d ___, 2020 WL 1952370 (11th Cir. 2020), which also concerned a governor's executive orders in response to COVID-19, the reason *Jacobson* came up at all was because the State raised it as a shield and the district court had gone through the exercise of considering it. *Robinson* at *5 ("The state argues that the order is a valid exercise of its power to issue public health orders during an emergency. It relies on *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905).") In affirming the district court's grant of injunctive relief against the Governor's action, the *Robinson* court nevertheless focused on the jurisprudence defining the individual right at stake – a woman's right to abortion – as the framework for its constitutional analysis and it dispensed with *Jacobson* simply by finding that the district court "did not err" in concluding the restrictions "impinge the right to an abortion," as defined by the *Roe-Casey* framework, in a "plain, palpable" fashion under *Jacobson*. *Id.* at *8.

Another important reason why *Jacobson* does not control here is that the case concerned restrictions enacted as laws through the state legislative process, and the court's deference to that legislative process was at the core of its decision. The court repeatedly emphasized the power of Massachusetts to enact "such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety," and that legislature was "primarily the judge" of the "good and welfare of the commonwealth" regarding quarantine and health laws. *Jacobson*, 197 U.S. at 24-25, 27. Thus, it was not for the court to judge which method "was likely to be the most effective for the protection of the public against disease" because "[t]hat was for the legislative department to determine in the light of all the information it had or could obtain," *id.* 30-31, in "its function to care for the public health and the public safety when endangered by epidemics of disease," *id.* at 37.

Here, by stark contrast, all the actions at issue, from the Governor's emergency orders which set into motion the Declaration of Judicial Emergency and the actions of the Judicial Qualifications Commission and the Council of Probate Judges, to Judge Wood's action in suspending the GWL application process, were taken unilaterally and entirely outside any considered legislative process. Nothing about this hasty, reactive decision-making all over a period of just days or weeks resembles the collective "will of [the state's] constituted authorities, acting in good faith for all, under the legislative sanction of the state." *Jacobson*, 197 U.S. at 37.

Furthermore, even if the Governor can be viewed as entitled to some penumbral deference, the Governor has previously expressed the view that the licensing process should *not* be suspended.  *See Carter v. Kemp,* No. 1:20-CV-1517-SCJ, Doc. 34, "Transcript of Proceedings Held April 15, 2020", p. 24 (N.D. Ga., April 15, 2020). Any deference *Jacobson* might require here thus cuts against the conduct of the Judge Wood in deviating from the views and judgments of the Governor.

Moreover, to the extent the rationale of *Jacobson* may have any application here, it is limited to the court's observations that, even as to considered legislative judgments entitled to deference, the courts must step in where the government action "has no real or substantial relation" to the claim objects, is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law," or is "so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression." *Jacobson*, 197 U.S. at 31, 37-38.

2. **Defendants Have Failed to Carry *Their* Burden of Proving that Alternatives Less Restrictive Than a Total Shutdown of GWL Applications Would be Ineffective in Achieving Their Stated Goals**

Under the controlling framework of *Heller-McDonald*, Plaintiffs have already stated their case that the constitutional infringement effects a total ban on the right to wear and bear handguns in case of confrontation, and is thus categorically unconstitutional, because it eliminates the sole means for Plaintiff Walters and all

those similarly situated to lawfully carry loaded handguns outside the limited confines of their homes, cars, and workplaces. They have also already made clear that, assuming the tiers of scrutiny come into play, strict scrutiny must be applied, but they are still "likely to succeed" even with intermediate scrutiny as the yardstick.

The hearing brings to the forefront another important point about why Plaintiffs are entitled to relief under any of these standards – it is the *Defendants*, not the Plaintiffs, who bear the burden of proving less restrictive alternatives do not exist or would be inadequate. *Ashcroft v. ACLU*, 542 U.S. 656, 669 (2004). "It is not enough for the Government to show that [its chosen action] has some effect." *Id*. It must prove that any substantially less restrictive alternatives would be less effective or ineffective. *Id.*; *BellSouth Corp. v. U.S.*, 868 F.Supp. 1335, 1342 (N.D. Ala. 1994). Plaintiffs bear no burden "to introduce, or offer to introduce, evidence that their proposed alternatives are more effective." *Ashcroft* at 669. And because "the Government bears the burden of proof on the ultimate question of [the action's] constitutionality, [plaintiffs] must be deemed likely to prevail unless the Government has shown that [plaintiffs'] proposed less restrictive alternatives are less effective than [the chosen action]." *Id.*; *accord Wollschlaeger v. Farmer*, 814 F.Supp.2d 1367, 1380 (S.D. Fla. 2011). Part and parcel of carrying this burden is proving that the government's chosen action *is* itself effective and *more* so than the available less restrictive alternatives in achieving the stated goals. *See Robinson*,

2020 WL 1952370 at *4, 7 & n. 2 (the court emphasized multiple times that the state had failed to present evidence proving its chosen action achieved the claimed goals, even noting the sort of evidence it "could have" presented but never did).

Here, the Defendants have fallen woefully short of carrying this burden. Significantly, in attempting to block the evidence on this point that Plaintiffs have presented (while simultaneously attempting to shift the burden of proof onto them), Defendants effectively concede that they have in fact presented *no* evidence on this point. They contend in their objection that the Plaintiffs' evidence – John Monroe's declaration that at a UPS store in Atlanta is currently conducting fingerprinting on a "'touchless' basis by having the applicant operate the machine himself or herself" – "was *the only evidence* presented to the Court that there were means, less restrictive than a temporary suspension, available to Judge Wood to address his public health concerns and continue to accept and process GWL's." Def. Joint Brief in Opp. to Plaintiffs' Exhibits, pp. 3-4 (italics added). It is now quite apparent from the record then that Judge Wood never even considered the possibility of this or any other less restrictive alternatives. His original declaration submitted in support of the Defendants' opposition to this preliminary injunction action made no mention at all of considering any alternatives to conducting any of the procedures through outside agencies or private vendors; he attested that he considered only "the size and layout

of the Probate Court" available to him at his courtroom facility in determining that all further GWL application procedures must entirely cease. Doc-25 ¶ 37.

Then, only after the hearing, on the afternoon of April 27th, at the apparent request of Defendants' counsel, Judge Wood contacted a UPS store in Cherokee County and was informed that this particular store is not currently offering fingerprinting services, and Defendants' counsel submitted a supplemental declaration to this effect. Doc 34-1. Judge Wood now further attests that his court has no existing contracts for such services with outside approved vendors. Doc 34-1, ¶ 10. Thus, it is clear he never investigated such alternatives or apparently any other alternatives – much less attempted to implement any alternatives in an effort to assess their utility – any time before he shut down the GWL application process way back on March 14th, or any time during the ensuing six weeks until April 27th. He has not, for example, even attempted to explain why he cannot implement the same touchless fingerprinting system used by the UPS Store in Atlanta when he has the same Livescan fingerprinting machine in his office that the UPS Store has, or why he cannot obtain an applicant's photograph through a remote web-cam connection or Zoom meeting rather than in person. Surely if this court can hold a hearing by Zoom with attorneys spread throughout the country, Judge Wood can obtain an electronic photograph without coming within 6 feet of an applicant.

Again, Plaintiffs bear no burden to prove that the use of outside vendors, or imitating the processes implemented by outside vendors, to conduct the fingerprinting, photographing, and other procedures related to the GWL application process would be a more effective, but less restrictive, method of meeting the general concerns about complying with COVID-19 safety protocols. *Ashcroft v. ACLU*, 542 U.S. at 669. It seems they surely would be, because utilizing the procedures of any vendors whose facilities *do* accommodate the recommended social distancing would meet the stated concerns underlying Judge Wood's decision. But it was the Defendants' burden to investigate and assess such alternatives and then *prove* with credible evidence that they were inadequate to meet the stated concerns. Without any such proof, and in fact in not having submitted proof irrefutably establishing that *no* lesser restrictive alternatives were *ever* even considered, the Defendants have failed to carry this burden necessary to defeat the request for relief under any form of scrutiny, even the *Jacobson* framework. It follows then that the Plaintiffs "must be deemed likely to prevail." *Ashcroft* at 669.

**E.     All Finger-Pointing Aside, What Matters is that Plaintiffs Are Entitled to the Relief They Seek and This Court Has the Power to Grant that Relief**

At the end of the day, a righteous claim for relief rests in this Court's hands, and the Defendants' obfuscation of responsibility with their convoluted blame-shifting cannot be allowed to stand in the way of affording Plaintiffs relief. The fact is, all the parties necessary to grant effective relief are present before this Court.

Judge Wood can be ordered to resume the acceptance and processing of GWL applications (through prohibitory or mandatory injunction), and the Governor and Commissioner Vowell can be prohibited from enforcing O.C.G.A. § 16-11-126 against Plaintiff Walters and all other similarly situated individuals – *i.e.*, those who are otherwise entirely eligible to obtain a GWL – unless and until the application process resumes. Plaintiffs have properly pleaded for both forms of relief in their complaint. Complaint, ¶¶ 59-61. Either way, the current state of affairs – where Plaintiff Walters and everyone like her is and has been for weeks now trapped in the untenable situation of being under a continuing threat of criminal prosecution if they exercise a constitutional right – cannot be tolerated. *U.S. v. Goodwin*, 457 U.S. 368, 372 (1982) ("For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.") This Court should look past the Defendants' fallacious attempts to shirk and shift responsibility for the obvious harms and should exercise the power it has to fix this.

### III.   CONCLUSION

Plaintiffs respectfully request that this Court grant their request for preliminary injunctive relief.

/s/ John R. Monroe
John R. Monroe
John Monroe Law, P.C.
156 Robert Jones Road
Dawsonville, GA  30534
678-362-7650
jrm@johnmonroelaw.com
State Bar No. 516193


/s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705
*Admitted Pro Hac Vice*


/s/ Adam Kraut
Adam Kraut, Esq.
Firearms Policy Coalition
Attorney for Plaintiffs
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
akraut@fpclaw.org
*Admitted Pro Hac Vice*

Attorneys for Plaintiffs


## RULE 7.1 CERTIFICATE

I certify that this brief was prepared with one of the font and point selections approved in Rule 5.1(B).

/s/ John R. Monroe
John R. Monroe