IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LISA WALTERS, et al.,

Plaintiffs,

vs.

BRIAN KEMP, et al.

Defendants.

)
)
)
)
)
)
)
)
)
)

CIVIL ACTION FILE NO.:

1:20-cv-1624-SCJ

## BRIEF IN SUPPORT OF GOVERNOR KEMP AND COLONEL VOWELL'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

COME NOW Defendants Brian Kemp, Governor of the State of Georgia, and Colonel Gary Vowell, Commissioner of the Georgia Department of Public Safety, and file this Brief in support of their Motion to Dismiss Plaintiffs' Complaint, showing the Court as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Lisa Walters, Second Amendment Foundation ("SAF"), and Firearms Policy Coalition, Inc. ("FPC"), filed the underlying 42 U.S.C. § 1983 lawsuit against Governor Kemp and Colonel Vowell in their official capacities ("State Defendants"), and Cherokee County and Probate Judge Keith Wood

("County Defendants"), alleging violations of the Second Amendment as applied to the State through the Fourteenth Amendment.  (Doc. 1).

Allegations of Plaintiffs' Complaint

Plaintiffs allege that Governor Kemp is the chief executive officer for the State of Georgia and obligated to ensure that laws are faithfully executed.  (Doc. 1, ¶ 7).  Plaintiffs further allege that Colonel Vowell is the chief executive for the Department of Public Safety and charged with overseeing, directing, implementing, and executing the State's regulatory schemes, laws, and enforcement policies, including O.C.G.A. § 16-11-126, which is the statute at issue in this lawsuit.  (*Id.*, ¶ 8).  More specifically, Plaintiffs allege that the regulatory framework outlined in O.C.G.A. § 16-11-126—which generally requires a Georgia weapons carry license ("GWL") in order to carry a loaded handgun beyond one's home, automobile, and place of business—violates the Second Amendment.  (*Id.*, ¶¶ 11-12, 26).  Plaintiffs allege that O.C.G.A. § 16-11-126 requires an application, fingerprinting, background check, and fees for individuals like Plaintiff Walters to obtain a GWL, but contains exemptions for several other categories of individuals.[1]

_____

[1] The exempted categories include peace officers, wardens, persons in military service, persons fulfilling defense contracts where possession is necessary for the contract, district attorneys and some of their personnel, state court solicitors-general and some of their personnel, designated employees of the State Board of Pardons and Paroles, Attorney General and designated staff, community

(*Id.*, ¶¶ 15, 19-23).  Plaintiffs contend that the exemptions are not supported by any legislative findings or declarations to justify why the exempted individuals do not require a license while others, like Plaintiff Walters, are required to obtain a GWL. (*Id.*, ¶¶ 21, 23).

Plaintiffs further allege that the County Defendants have stopped accepting new GWL applications during the public health state of emergency and judicial emergency declaration that were issued in response to the COVID-19 public health crisis.  (*Id.*, ¶¶ 28-30).  Plaintiffs contend that Plaintiff Walters would qualify for a GWL if given the opportunity to apply.  (*Id.*, ¶¶ 32, 39, 41).  Plaintiffs allege that since the county stopped processing GWL applications, Walters and other members of the Plaintiff organizations are denied the right to carry a handgun outside of their home.  (*Id.*, ¶31).  Plaintiffs allege that without a GWL, Plaintiff Walters and others like her could be charged with a misdemeanor under O.C.G.A. § 16-11-126, and disqualified from obtaining a GWL for five years if convicted. (*Id.*, ¶¶ 16-17).  Plaintiffs contend that the State, under the direction of Colonel Vowell, "routinely enforces" O.C.G.A. § 16-11-126 against individuals who

---

supervision officers, public safety directors, explosive ordinance disposal technicians, current and former judges and justices, U.S. Attorneys and Assistant U.S. Attorneys, county medical examiners and coroners, superior court clerks, and magistrate court constables.  O.C.G.A. § 16-11-130(a)(1)-(16).

3

possess handguns outside of their homes, automobiles, and places of business without a GWL. (*Id.*, ¶ 14).

Plaintiffs' Complaint includes only one count, and regarding the State Defendants, alleges that their right to keep and bear arms is violated because Plaintiff Walters, and others like her, are "effectively and completely prevent[ed]" from "carrying a loaded, operable handgun on their person outside of their homes, personal vehicles, and workplaces in any manner under O.C.G.A. § 16-11-126." (*Id.*, ¶ 54).

In relief, Plaintiffs seek: (1) a declaration that the Second Amendment guarantees a right to carry a loaded handgun on one's person for self-defense in public and outside of one's home, automobile, and place of business; (2) a declaration that O.C.G.A. § 16-11-126 and its enforcement violate the Second Amendment; (3) a declaration that the County Defendants' order and policies violate the Second Amendment; (4) an injunction prohibiting Governor Kemp or his employees, officers, agents, or representatives from enforcing O.C.G.A. § 16-11-126; (4) an injunction prohibiting Colonel Vowell or his employees, officers, agents, or representatives from enforcing O.C.G.A. § 16-11-126; (5) an injunction prohibiting the County Defendants from refusing to process GWL

applications; (6) nominal damages against the County Defendants; and (7) attorney's fees and expenses. (*Id.*, ¶¶ 56-64).[2]

Evidence Regarding O.C.G.A. § 16-11-126 Enforcement[3]

The Department of Public Safety ("DPS") is comprised of the Georgia State Patrol, Georgia Capitol Police, and the Motor Carrier Compliance Division ("MCCD"), with 1,071 law enforcement officers posted in regions across the State of Georgia. (*See* Declaration of Sgt. Gary Langford, attached hereto as Exhibit 1, ¶ 2). Under Georgia law, a person carrying a weapon is not subject to detention for the sole purpose of investigating whether they have a weapons carry license. (*Id.*, ¶ 4). DPS Officers are taught that they may not detain an individual to investigate whether or not the individual has a Georgia weapons license and that they should treat every encounter with an individual possessing a weapon as though that individual has a license. (*Id.*, ¶¶ 6-9). Officers patrolling Capitol Square do not investigate whether an individual has a weapons license unless the officer has a

---

[2] Plaintiffs also filed a Motion for Temporary Restraining Order or Preliminary Injunction, which was denied on May 5, 2020. Order (Doc. 41).

[3] This Court may consider facts outside of the pleadings in ruling on a Rule 12(b)(1) motion to dismiss. *See, e.g., Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008) (". . . it is well-established that a judge may make factual findings about subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss.") (citing *Williamson v. Tucker*, 645 F.2d 404, 412-13 (5th Cir. 1981)).

minimum of reasonable, articulable suspicion that a crime—separate from any weapons carry license violation—is being committed or has been committed. (*Id.*, ¶ 7). Officers at the Capitol have been instructed that when members of the public carry weapons inside the Capitol, up to the screening checkpoint, those individuals have a right to retreat to put the weapon back in their vehicle; they do not ask whether the individual has a Georgia weapons license. (*Id.*, ¶ 8). State Trooper and MCCD Officers do not investigate whether or not a motorist has a Georgia weapons carry license during a traffic stop for minor traffic violations. (*Id.*, ¶ 10). State Troopers are instructed that if they pull someone over in their vehicle, and the individual has a weapon, the traffic stop alone is not sufficient to investigate whether or not the individual has a Georgia weapons license, even if the individual has exited the vehicle with their weapon. (*Id.*, ¶¶ 9-10). If a weapon is possessed by an occupant of a vehicle during a traffic stop and the reason for the stop escalates, then the DPS officers may further investigate the lawfulness of possession of the weapon. (*Id.*, ¶ 10). With escalations, a citation for violation of O.C.G.A. §16-11-126 is generally a lesser included charge. For example, an escalation would arise when an occupant's status would make the possession of the weapon illegal, including possession by a convicted felon or possession by a minor under the age of 18. An escalation could also arise when there is reasonable

articulable suspicion or probable cause of other criminal activity, such as possession during the commission of certain crimes, which would include theft of the motor vehicle.  (*Id.*)

For the last two years, the Georgia State Patrol has issued a total of 14 citations for the offense of carrying a weapon without a license in violation of O.C.G.A. § 16-11-126, and 3 of the 14 total citations were issued to 1 individual at the time of a single arrest.  (*Id.*, ¶¶ 13-14).  Each time a citation was issued for the offense of carrying a weapon without a valid weapons-carry license, citations were also issued for other distinct offenses that resulted in an arrest.  (*Id.*, ¶¶ 15-16). The Georgia Capitol Police and MCCD have not issued any citations for a violation of O.C.G.A. § 16-11-126 in the past two years.  (*Id.*, ¶ 12).

For the reasons that follow, Plaintiffs' Complaint against Governor Kemp and Colonel Vowell should be dismissed.

## ARGUMENT AND CITATION TO AUTHORITY

Plaintiffs' Complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim.  As an initial matter, Plaintiffs lack standing to bring this action against Governor Kemp and Colonel Vowell because they have suffered no concrete injury which is traceable to any action taken by the State Defendants.  Plaintiffs' claims have also become moot since the filing of

their Complaint.  In addition, Plaintiffs' claim against the State Defendants is barred by the Eleventh Amendment and does not fit within the *Ex Parte Young* exception to the immunity bar.  Plaintiffs' claim is further barred by the Eleventh Amendment because the gravamen of Plaintiffs' Complaint is a matter of state law. Finally, Plaintiffs fail to state a claim against the State Defendants for a violation of the Second and Fourteenth Amendments.

## I.    Plaintiffs' Complaint Should be Dismissed for Lack of Subject Matter Jurisdiction.

A complaint is subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(1) where the district court lacks subject matter jurisdiction

### A.  Plaintiffs lack standing to challenge O.C.G.A. § 16-11-126.

Article III of the Constitution restricts judicial power "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).  "Standing doctrine 'reflect[s] this fundamental limitation' and 'requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant  . . . invocation of federal court jurisdiction.'" *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018) (quoting *Summers*, 555 U.S. at 492).  This limitation is "founded in concern about the proper – and

8

properly limited – role of the courts in a democratic society." *Summers*, 555 U.S. at 492.

The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Standing elements are "not mere pleading requirements, but rather an indispensable part of the plaintiff's case," and the manner and degree of evidence required to demonstrate the existence of standing varies depending upon the stage of the litigation. *Ga. Republican Party*, 888 F.3d at 1201.

> It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*U.S. v. Hays*, 515 U.S. 737, 742-743 (1995) (quoting *Lujan*, 504 U.S. at 560-561). A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing

to invoke the federal judicial power." *Hays*, 515 U.S. at 743.  An injury in fact must be concrete.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  "A 'concrete' injury must be 'de facto'; that is, it must actually exist."  *Id.*  (quoting Black's Law Dictionary 479 (9th ed. 2009)).  The Supreme Court has explained:

> When we have used the adjective "concrete," we have meant to convey the usual meaning of the term — "real," and not "abstract." Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967). Concreteness, therefore, is quite different from particularization.

*Spokeo*, 136 S. Ct. at 1548.  The injury must also be "fairly traceable" to the challenged conduct.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Here, both the individual and organizational Plaintiffs have failed to articulate any concrete injury, and both have failed to demonstrate facts sufficient to establish a causal connection that is "fairly traceable" to either Governor Kemp or Colonel Vowell.

### 1.    Plaintiff Walters Has Not Established Standing.

Plaintiff Walters asserts that but for her "fear and risk of arrest and criminal prosecution" she would possess a handgun outside of her home.  (Doc. 1, ¶ 44). However, any fear of arrest and prosecution is speculative and not reasonable in light of state law *prohibiting* law enforcement officers from detaining Plaintiff to inquire about her permit.  *See* O.C.G.A. § 16-11-137(b).  In addition, although

Plaintiffs characterize the requested relief as necessary to practice self-defense in public, Georgia law already provides an "absolute defense" to any violation of O.C.G.A. § 16-11-126 where the individual is acting in the "[d]efense of self or others." O.C.G.A. § 16-11-138; *see also Johnson v. State*, 2020 Ga. LEXIS 136, at *6-7 (Feb. 28, 2020).[4]  Defendants recognize that an "actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [the] law." *Driehaus*, 573 U.S. at 158-159.  However, there must be "a credible threat of prosecution" under the challenged statute. *Id.* at 159 (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)).  "[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases." *Younger v. Harris*, 401 U.S. 37, 42 (1971) (explaining that parties without reasonable threat of prosecution lacked standing despite allegations that they "feel inhibited" by criminal statute).  Similarly, here, there is no threat of prosecution because law enforcement officers are prohibited by statute

---

[4] This exception even applies to possession of weapons by a felon during the period of self-defense.  Of course, for a felon, possession of a weapon "prior to any necessity arising and . . .  after any necessity dissipated . . . would be felonious and prosecutable."  *Johnson*, 2020 Ga. LEXIS 136 at *7 n. 7; *see also State v. Remy*, 2020 Ga. LEXIS 178 (March 13, 2020).  In the absence of a statutory prohibition to the possession of a weapon, independent from simply the licensure requirement, Defendant is not aware of any cases applying this same before-during-after analysis to the application of O.C.G.A. § 16-11-138.

from detaining anyone for the purpose of establishing whether they have a license. In other words, unless law enforcement has "a minimum of reasonable, articulable suspicion that a crime is being committed or has been committed," (Exhibit 1, ¶¶ 7, 10) there is no possibility of arrest and prosecution.  In fact, during the past two years, the Department of Public Safety ("DPS") has only issued fourteen (14) citations, to twelve (12) individuals, for violation of O.C.G.A. § 16-11-126(h).  In each case, the underlying cause of the traffic stop was the suspected commission of a separate and distinct criminal offense.  (Exhibit 1, ¶ 16).  DPS trains its officers to "treat every encounter with an individual possessing a weapon as though that individual has a Georgia weapons license."  (*Id.*, ¶ 6).  State Troopers are similarly instructed, and are "instructed that if they pull over a vehicle, and the driver or passenger has a weapon, the traffic stop is *not* sufficient to investigate whether or not the individual has a Georgia weapons carry license, even if the individual has exited the vehicle with their weapon." [5]  (*Id.*, ¶ 9)

Under these circumstances, a generalized fear that Plaintiff will be prosecuted for carrying a gun without a license is not sufficiently concrete to

---

[5] Of course, DPS has no control over local law enforcement agencies.  However, the statutory prohibition on detention solely to investigate whether someone has a license is equally applicable to other law enforcement agencies.  Moreover, the burden is on Plaintiffs to demonstrate a concrete injury, not on Defendants to disprove injury. *Lujan*, 504 U.S. at 561.

confer standing.  *Clapper*, 568 U.S. at 410 (rejecting "reasonable likelihood" of injury as sufficient to meet the injury in fact standard).  Here the Complaint seeks to address purely speculative injuries.

To the extent that Plaintiff Walters sufficiently alleges an injury, that injury is not traceable to either State Defendant.  Despite some general language to the contrary, the one count Complaint challenges Plaintiff's inability to possess a weapon because she cannot get a GWL.  (Doc. 1, ¶¶ 12, 31, 32, 39, 41, 44, 48, 54). Plaintiffs' inability to obtain a GWL is a result of a judicial emergency and other government officials' decision to suspend issuing licenses and is not "fairly . . . traceable" to either State Defendant's conduct "as opposed to the action of . . . a third party."[6]  *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296 (11th Cir. 2019) (*en banc*); *see also Jacobson v. Florida Secretary of State*, 2020 U.S. App. LEXIS 13714, *24 (11th Cir. April 29, 2020); *Clapper*, 568 U.S. at 411 (holding that speculation about whether Plaintiffs would be subjected to surveillance under the challenged federal statute, "or some other authority—shows that [Plaintiffs]

---

[6] Plaintiffs' inability to obtain a GWL is now moot, as those county officials are currently scheduled to resume processing GWL applications beginning May 14, 2020.  *See*  https://www.cherokeega.com/Probate-Court/Apply-for-a-Weapons-Carry-License/.

cannot satisfy the requirement that any injury in fact must be fairly traceable to"
the challenged statute).

Any claims premised on the judicial emergency declaration and decision of
the County Defendants to stop processing GWL applications during the state of
emergency is not fairly traceable to the State Defendants since they do not exercise
control over the judiciary or otherwise direct the judiciary's decision-making or
court operations.  To do so would violate the separation of powers mandated by
Georgia's Constitution:

> The legislative, judicial, and executive powers shall forever remain
> separate and distinct; and no person discharging the duties of one shall
> at the same time exercise the functions of either of the others except
> as herein provided.

Ga. Const. Art. I, Section II, Para. III.[7]  This doctrine of separation of powers
"invests those officials charged with the duty of administering justice according to
law with all necessary authority to efficiently and completely discharge those
duties the performance of which is by the constitution committed to the judiciary,
and to maintain the dignity and independence of the courts."  *Lovett v. Sandersville
R.R.*, 199 Ga. 238, 239-240 (1945); *see also Cormier v. Horkan*, 2010 U.S. Dist.

---

[7] Under the Georgia Constitution, the General Assembly has express authority to
"prescribe the manner in which arms may be borne."  Ga. Const. Art. I, Section I,
Para. VIII.  The General Assembly established a framework and tasked the probate
courts with issuing licenses as set forth in O.C.G.A. § 16-11-129.

LEXIS 12146, at *22-23 (M.D. Ga. 2010) (rejecting claim that Governor had supervisory authority over judiciary as a matter of law) (vacated and remanded on other grounds). The State Defendants cannot be held liable for conduct over which they have no control or authority.

The Eleventh Circuit's recent decision in *Jacobson* reaffirms that "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party.'" *Id*. at 29 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Relying on *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296 (11th Cir. 2019) (*en banc*), the *Jacobson* Court held that a state official's general supervisory responsibility for the administration of various statutes was insufficient to meet the causation prong of the standing requirement. *Id*. at 31-32. Similarly, here, the State Defendants' general authority to enforce the laws of Georgia, is insufficient to satisfy the causation prong of standing. As in *Jacobson,* here, "[b]ecause the [Defendant] didn't do (or fail to do) anything that contributed to [Plaintiffs'] harm," Plaintiffs "cannot meet Article III's traceability requirement." *Id.* at 30 (quoting *Lewis*, 944 F.3d at 1301).

### 2.  Plaintiffs, FPC and SAF, have not established standing.

As organizational plaintiffs, FPC and SAF may make the three-pronged showing under two alternative theories: (1) the "diversion-of-resources theory" in which the organizational plaintiff asserts standing on its own behalf by alleging facts showing that the defendants' allegedly "illegal acts impaired the organization's ability to engage in its own projects by forcing the organization to divert resources in response"; or (2) the "associational theory" in which the organizational plaintiff asserts standing in a representational capacity for its members where "the members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Arcia v. Sec'y of Florida*, 772 F.3d 1335, 1341-1342 (11th Cir. 2014).  Plaintiffs rely on both a "diversion of resources" theory and "associational theory" to prove standing.  (Doc. 1, ¶¶ 5, 6).

### a.  Diversion of resources theory

In *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1982), the Supreme Court established the principle that an organization's diversion of resources in response to a defendant's allegedly illegal conduct could constitute "injury in fact" for purposes of demonstrating standing.  That case considered whether a nonprofit

housing organization had standing to sue an apartment complex for alleged violations of the Fair Housing Act.  In holding that the group had standing, the Court concluded that the defendants' racial steering practices had "perceptibly impaired [plaintiff's] ability to provide counseling and referring services for low and moderate-income home-seekers," thus resulting in a concrete injury-in-fact to the organization.  *Havens Realty*, 455 U.S. at 379.   The Court, however, made clear that it was necessary to allege a "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources" – and that "a setback to the organization's abstract social interests" was *not* to sufficient to demonstrate an injury in fact for purposes of standing.  *Id.*

Since *Havens*, federal courts addressing organizational standing have examined whether the lawsuit alleges that the defendant's conduct resulted in actual or imminent harm to the organization by forcing it to divert resources from other projects and interfering with its normal daily activities.  "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an inhibition of the organization's daily operations." *Food & Water Watch*, 808 F.3d at 919.  The courts have been clear that a "conflict between a defendant's conduct and [an] organization's mission is alone insufficient to

establish Article III standing." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996).

Costs associated with litigation, including identifying witnesses and potential violations, are *not* injuries for purposes of conferring standing because they do not involve harm to the daily operations of the entity: "[P]laintiffs cannot bootstrap the cost of detecting and challenging the illegal practices into injury for standing purposes." *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).

Two "key factors" in determining whether an organizational plaintiff has demonstrated standing under a diversion of resources theory is "whether the injury relates to the organization's mere advocacy objectives," which is insufficient to confer standing, or "if instead, it undermines the organization's direct, non-advocacy services," which would demonstrate injury-in-fact. *Int'l Acad. Of Oral Medicine & Toxicology,* 195 F. Supp. 3d 243, 256 (D.D.C. 2016). "Another [key factor] is whether the organization truly 'diverted' any resources at all; in other words did the challenged agency action cause it to incur 'operational costs beyond those normally expended' to carry out its day-to-day mission of educating the public or advancing its advocacy mission." *Id.*

Here, Plaintiffs' Complaint includes only one allegation regarding the alleged diversion of resources, and only regarding one of the two organizational Plaintiffs.  (*See* Doc. 1, ¶ 6 (alleging that "FPC has expended and diverted resources, and is adversely and directly harmed, because of Defendants' Orders, and related laws, policies, practices, and customs challenged herein.")).   The Complaint contains no other allegation to support a diversion of resources theory of standing.

This sole allegation is insufficient in several respects.  First, it provides absolutely no information as to how Plaintiff FCP's day-to-day operations were in fact impacted by this alleged diversion of resources.[8]  Second, there are no allegations that the areas where resources were allegedly diverted to were not in fact already part of the Plaintiffs' normal operations.[9]  Third, there are no allegations of specific adverse effects on pre-litigation normal operations.[10]  For

---

[8] Organizational plaintiffs relying upon a diversion of resources theory must identify specific projects where resources were diverted.  *Jacobson*, 2020 U.S. App. LEXIS 13714, *24; *Browning*, 522 F.3d at 1166.

[9] In order to qualify as an injury-in-fact, the organization's expenditures must be for "operational costs beyond those normally expended." *Food & Water Watch*, 808 F.3d at 920.  *See also City of Kyle*, 626 F.3d at 238; *PETA v. United States Dep't of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

[10] "An organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that

these reasons, Plaintiffs' allegations are insufficient to assert standing through a diversion of resources theory.

Finally, even if Plaintiffs had alleged sufficient facts to demonstrate a diversion of resources, Plaintiffs still have not alleged standing because the diversion of resources for an underlying harm that is speculative and uncertain, i.e., that their members and others like them will be arrested and prosecuted for carrying a weapon without a Georgia weapons carry license, is insufficient to establish standing.

In *Clapper* the Supreme Court made clear that a plaintiff cannot claim harm for purposes of standing based on costs incurred "as a reasonable reaction to a risk of harm" when the harm "is not certainly impending." "In other words, [plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.*

---

cannot qualify as an injury in fact for purposes of standing." *PETA*, 797 F.3d at 1093. *See also Nat'l Consumers League v. General Mills*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) (declining to find Article III standing where the organization plaintiff "has merely chosen to devote its resources to challenge [defendant's] conduct by filing this suit, much like 'the self-inflicted harm' of challenging a regulation.")

### b.  Associational standing theory.

Plaintiffs FPC and SAF also assert standing by way of an "associational" standing theory.  Organizations may assert "associational" or "representational" standing to enforce the rights of its members where "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sierra Club v. TVA*, 430 F.3d 1337, 1344 (11th Cir. 2005) (quoting *Friends of the Earth v. Laidlaw Environ. Servs.*, 528 U.S. 167, 181 (2000)); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009); *Amnesty Int'l. v. Battle*, 559 F.3d 1170, 1178 (11th Cir. 2009).  Here, FPC and SAF fail on the first prong.  As demonstrated above, Plaintiff Walters, and other FPC and SAF members, do not have standing to sue because they have no concrete injury in fact traceable to the State Defendants.  For this reason, FPC and SAF cannot establish standing premised on an associational theory of standing.

### B.  Plaintiffs' claims are moot.

Pursuant to "Article III of the United States Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Brooks v. Ga. State Bd. of*

*Elections*, 59 F.3d 1114, 1118 (11th Cir. 1995).  "[I]t is incumbent upon [a] court to consider issues of mootness *sua sponte*." *Id.* quoting *Pacific Ins. Co. v. General Development Corp.*, 28 F.3d 1093, 1096 (11th Cir. 1994).  While standing is measured at the time of the filing of the lawsuit, *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1275 (11th Cir. 2003), mootness and standing are often connected:  "the doctrine of mootness can be described as 'the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)).  "[D]ismissal is compulsory as federal subject matter jurisdiction vanishes at the instant the case is mooted." *Beta Upsilon Chi Upsilon Chptr. v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009) (internal citation omitted). "Past exposure to illegal conduct does not in itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing, present injury or real and immediate threat of repeated injury." *Dudley v. Stewart*, 724 F. 2d 1493, 1494 (11th Cir. 1984) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).  Here, the Cherokee County Probate Judge has announced that he

has begun processing GWL applications, effective today, May 14, 2020.[11]  *See also* Doc. 56-2, Declaration of Judge Keith Wood, ¶ 3.  Judge Wood further testifies that he has "no intention of reinstating the temporary suspension of acceptance or processing of GWLs or otherwise ceasing the acceptance and processing thereof." *Id.*, ¶ 10.  Judge Wood testifies that he has implemented new procedures within the office to maintain social distancing and further testifies that his decision to begin processing GWL applications is consistent with the May 11, 2020 Order of Chief Justice Melton extending the State of Judicial Emergency through less restrictive means.  *Id.*, ¶¶ 6-9.  Plaintiff Walters, and other similarly situated members of SAF and FPC, may now apply for and obtain a GWL as provided in O.C.G.A. § 16-11-129.  Plaintiff no longer has the necessary "personal stake" in the outcome of the equitable relief claims because the former obstacle to obtaining a GWL has been removed.  *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 478 (1990).

In this Circuit, "a challenge to governmental action has been mooted when the alleged wrongdoers have ceased the allegedly illegal behavior and the court can discern no reasonable chance that they will resume it upon termination of the suit." *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1284 (11th Cir. 2004); *See also Jews for Jesus, Inc. v. Hillsborough County Aviation Auth.*, 162 F.3d 627, 629

---

[11] https://www.cherokeega.com/Probate-Court/Apply-for-a-Weapons-Carry-License/ (last visited on May 13, 2020).

(11th Cir. 1998) (holding that where a prior policy had changed "there [was] no meaningful relief left for the court to give.  The only remaining issue [was] whether the [defendant's] policy *was* constitutional – which . . . [was] a purely academic point.") (emphasis in original).  Here, where state law provides a process for issuing GWL's and the suspension of that process was of a temporary nature in light of a judicial emergency, there is no reason to believe that the Cherokee County Probate Court will revert back to suspending the issuance of licenses in the future.   "[G]overnmental entities and officials [are] given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities."  *Nat'l Adver. Co.*, 402 F.3d at 1333-1334 (quoting *Coral Springs St. Sys. v. City of Sunrise*, 371 F.3d 1320, 1328-29 (11th Cir. 2004)); *Jacksonville Prop. Rights Ass'n v. City of Jacksonville*, 635 F.3d 1266, 1274 (11th Cir. 2011) (recognizing rebuttable presumption in favor of government actors).  Plaintiffs' Complaint should be dismissed as their claim is now moot.

### C. Plaintiffs' claims against the State Defendants are barred by the Eleventh Amendment.

The Eleventh Amendment bars suit against a State's agencies, departments, or officials, absent a waiver by the State or a valid congressional override, when the State is the real party in interest or when any monetary recovery would be paid from State funds.  *Kentucky v. Graham*, 473 U.S. 159, 163 (1985); *Pennhurst State*

*Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984).  Because claims against public officials in their official capacities are merely another way of pleading an action against the entity of which the officer is an agent, "official capacity" claims against a state officer are included in the Eleventh Amendment's bar.  *Kentucky*, 473 U.S. at 165.

An exception to Eleventh Amendment immunity exists under *Ex parte Young*, 209 U.S. 123 (1908), for suits against state officers for prospective injunctive relief.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n. 24 (1997).  However, "[i]n making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party."  *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000) (quoting *Ex parte Young*, 209 U.S. at 157 and declining to apply the exception where Defendants had no authority to enforce the challenged statutory provision).  "Under *Ex Parte Young*, a litigant must bring his case 'against the state officer or agency responsible for enforcing the allegedly unconstitutional scheme."  *Osterback v. Scott*, 782 Fed. Appx. 856, 858-859 (11th Cir. 2019) (quoting *ACLU v. The Florida Bar*, 999 F.2d

1486, 1490 (11th Cir. 1993)).  Here, there is no connection between the State

Defendants and the decision of a member of the judicial branch to suspend

processing weapons licenses.[12]

## II.    Plaintiffs have failed to state a claim that Georgia's "shall issue" carry-license requirement violates the Second Amendment as applied to "law abiding citizens."

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint is subject

to dismissal if it does not "state a claim upon which relief can be granted."

Fed.R.Civ.P. 12(b)(6).  When reviewing a motion to dismiss, the Court must take

the allegations of the complaint as true, and must construe those allegations in the

light most favorable to the plaintiff.  *Riven v. Private Health Care Sys., Inc.*, 520

F.3d 1308, 1309 (11th Cir. 2008).  However, "the tenet that a court must accept as

---

[12] Although Plaintiffs' Complaint asserts only federal constitutional claims, as this Court recognized in *Carter*, any claims premised on an alleged violation of state law are also arguably barred by the Eleventh Amendment under *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984).  *Carter*, No. 1:20-CV-1517-SCJ, Order on Motion for Temporary Restraining Order at 20-21 n. 11.  *See also Doe v. Bush*, 261 F.3d 1037, 1055 (11th Cir. 2001) (explaining that "federal courts do not have the authority to compel state actors to comply with state law."); *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1205 (11th Cir. 2010) (First Amendment claim barred where "gravamen of the complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute"); *DeKalb Cty. Sch. Dist. V. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997) (holding claims barred where "gravamen of its complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute governing reimbursement for transportation costs.").  Similarly, here, the gravamen of Plaintiffs' Complaint is they cannot currently obtain a license, as both required and provided for by state law.

true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Amer. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (courts are to "eliminate any allegations in the complaint that are merely legal conclusions").

For the reasons already explained, Plaintiffs lack standing to bring their as-applied constitutional claims against Governor Kemp and Colonel Vowell based on the temporary suspension of licensing, and those claims are now moot, so they must be dismissed. *See* infra at I.A, I.B; Doc. 41, Order on Motion Prelim. Inj. at 14–15.

Although Plaintiffs' Complaint focuses largely on the probate court's temporary suspension of licensure, the Complaint also arguably frames a broader challenge to the GWL statute as a whole, at least as applied to "law abiding citizens." For example, Plaintiffs allege that the GWL statute is a "general carry ban" that infringes on their Second Amendment rights, (Doc. 1, ¶ 26), and further allege that a "complete prohibition" on handgun possession is "necessarily invalid," (*id.*, ¶ 38). (*See also id.*, ¶ 31 (alleging that Plaintiffs have been "denied any chance to lawfully carry" handguns in public)). But then, in their motion for a temporary restraining order and preliminary injunction, Plaintiffs explained that, by "total ban," they meant only the present inability to obtain a GWL, (Doc. 2 at

2–3).  The better view in light of that later statement is that they challenge only the combined effect of the licensing requirement and the temporary suspension, and not the licensing statute as applied once the suspension is lifted.  But if this Court construes the complaint as raising this broader challenge, that claim, too, should be dismissed.

The Eleventh Circuit, like most circuits, has identified a two-part test for Second Amendment claims: "(1) Is the restricted activity protected by the Second Amendment in the first place? (2) If so, does it pass muster under the appropriate level of scrutiny?" *GeorgiaCarry.Org, Inc. (II) v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1324 (11th Cir. 2015).[13]  The analysis of Georgia's carry-license statute need not proceed past the first question because historical practice confirms that the Second Amendment does not prohibit minimally burdensome licensing laws like Georgia's "shall issue" regime.

---

[13] In their motion for a temporary restraining order, Plaintiffs largely omitted this analysis, arguing instead that the temporary suspension of licensing is "categorically unconstitutional." (Doc. 2 at 2).  They derive this argument from *GeorgiaCarry.Org II*, which rejected an identical argument as a "swing for the fences." 788 F.3d at 1325.  Because the GWL requirement is not a total ban on handgun possession under any definition, Plaintiffs cannot defend their broader challenge to the statute with this argument.  Even if they try, that argument fails for the reasons provided in the State Defendants' response to the motion for a temporary restraining order. (Doc. 26 at 28–31).

Step one of the Eleventh Circuit's test turns on "the historical background of the Second Amendment." *GeorgiaCarry.Org, Inc. (I) v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012). The basic question is whether the challenged restriction infringes the right to bear arms as it was understood historically. *See D.C. v. Heller*, 554 U.S. 570, 592 (2008) (explaining that the Second Amendment codified a pre-existing right); *Wrenn v. D.C.*, 864 F.3d 650, 658 (D.C. Cir. 2017) (same). Most relevant here, in *Heller*, the Supreme Court identified a nonexhaustive list of "presumptively lawful regulatory measures," including "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places." 554 U.S. at 626 & n.26.

Basic carry-license requirements like Georgia's are one of these "presumptively lawful regulatory measures" because they are deeply rooted in American historical practice. In fact, such requirements had been well-accepted in England for centuries before the English Bill of Rights, which served as an inspiration to our Second Amendment. *See id.* at 593. English law prohibited anyone from "going armed within the realm without the king's special licence" beginning in at least 1299. *Peruta v. Cty. of San Diego*, 824 F.3d 919, 929 (9th Cir. 2016) (en banc). The Statute of Northampton, passed in 1328, codified that rule for centuries. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside*

29

*the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 11–19 (2012).  And "[t]he status quo remained after the adoption of the 1689 English Declaration of Rights 'have arms' provision": "A person was required to obtain the crown's license to go armed in the public concourse." *Id.* at 27; *see also id.* at 31–32 (explaining that at least Massachusetts, Virginia, and North Carolina expressly incorporated the Statute of Northampton into state law "in the years immediately after the adoption of the Constitution").

Following the American Revolution, States continued to regulate where and how firearms may be carried. *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 J. Law & Contemp. Problems 55, 59 (2017) (finding 31 different state-law carry restrictions passed between 1791 and 1867, and another 48 between 1868 and 1899).  These kinds of carry restrictions were uniformly upheld. *City of Salina v. Blaksley*, 72 Kan. 230, 83 P. 619, 620 (1905) ("It has, however, been generally held that the Legislatures can regulate the mode of carrying deadly weapons, provided they are not such as are ordinarily used in civilized warfare.").  Georgia cases demonstrate the typical analytical framework. *See Nunn v. State*, 1 Ga. 243, 249 (1846) (holding that carry restrictions which destroy the right to bear arms are unconstitutional but observing that regulations of "the manner of bearing arms" are not); *Strickland v. State*, 137

Ga. 1, 72 S.E. 260, 264 (1911) (explaining that "the regulatory provisions" of Georgia's carry-licensing act did not amount to "an infringement of the right as protected by the Constitution").

Post-*Heller*, federal circuit courts have disagreed about the contours of the Second Amendment right in many respects, including the strength of the right outside the home, and whether more restrictive registration or licensing requirements infringe the right. *Compare Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012) ("[O]ne doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home."); *Wrenn v. D.C.*, 864 F.3d 650, 658 (D.C. Cir. 2017) (holding that "the Second Amendment squarely covers carrying beyond the home for self-defense" and enjoining D.C.'s "good reason" law that limited issuance of concealed-carry licenses to those who could show a special need for self-defense); *with Peruta v. Cty. of San Diego*, 824 F.3d 919, 924 (9th Cir. 2016) (reversing the panel's holding that the Second Amendment requires that some form of concealed carry be permitted outside the home); *Woollard v. Gallagher*, 712 F.3d 865, 882 (4th Cir. 2013) (upholding Maryland's "good-and-substantial-reason" requirement as constitutional); *Drake v. Filko*, 724 F.3d 426,

440 (3d Cir. 2013) (same for New Jersey); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 101 (2d Cir. 2012) (New York).

But for all of their disagreement, courts have agreed that basic licensing requirements like Georgia's do not infringe on the Second Amendment right. *See Heller*, 554 U.S. at 633 (characterizing a 1721 Pennsylvania law which prohibited discharging a weapon within Philadelphia unless the person first obtained a license as "at most a licensing regime"); *Wrenn v. D.C.*, 864 F.3d 650, 667 (D.C. Cir. 2017) (explaining that "traditional limits" on the scope of the Second Amendment "include, for instance, licensing requirements"); *Ezell v. City of Chicago*, 651 F.3d 684, 705 & n.13 (7th Cir. 2011) (describing eight laws from the eighteenth and nineteenth centuries that required citizens to obtain a license before discharging firearms as "merely *regulatory* measures"); *Heller v. D.C.*, 670 F.3d 1244, 1253–54 (D.C. Cir. 2011) (listing examples of firearm licensing and registration laws); *id.* at 1254 (finding that "basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous"); *id.* at 1291 (Kavanaugh, J., dissenting) (disagreeing that *registration* requirements for every firearm have deep historical roots, but agreeing that "many

jurisdictions that permit the carrying of concealed weapons have traditionally imposed licensing requirements").

Georgia's minimal carry-license regime falls into that uncontroversial category of presumptively lawful regulations. As an initial matter, Georgia's statute allows carrying firearms in a number of settings and circumstances. O.C.G.A. § 16-11-126(a)–(g) (requiring no license to carry a handgun in your home, vehicle, place or business, among other places, and further allowing long guns to be carried openly anywhere without a license). Moreover, unlike state laws that require "good reasons" or other burdensome showings to carry a firearm in public—laws which the State Defendants agree would infringe the right to bear arms as traditionally understood—Georgia law ensures in normal times that all law-abiding adults who wish to carry a handgun in public will be able to do so without difficulty or delay. Indeed, Georgia is a "shall issue" state: probate courts "shall . . . issue" GWLs to all individuals who complete an application and pass the background check. *Id.* at § 16-11-129(a)(1). And probate courts have no discretion to deny licenses to someone who meets these basic requirements. *See Ferguson v. Perry*, 292 Ga. 666, 666 (2013); Op. Atty. Gen. No. U89-21, Aug. 25, 1989.[14] In

---

[14] Carry licenses will be denied to applicants that are (1) under 21 years old, (2) have been convicted of certain criminal offenses, or (3) have been hospitalized for mental illness or found mentally incompetent. O.C.G.A. at 16-11-129(b)(2). But

short, Georgia's "shall issue" carry-license regime is the kind of regulatory provision that has never been thought to infringe on the Second Amendment right to bear arms, its state-law analogues, or its English-law predecessors.  To the extent that Plaintiffs challenge Georgia's carry-license requirements beyond the circumstances of the temporary suspension at issue here, they have failed to state a claim that it violates the Second Amendment.

## CONCLUSION

Because Plaintiffs' Complaint fails to establish standing, is barred by the Eleventh Amendment, and fails to state a claim against Governor Kemp and Colonel Vowell, the Complaint should be dismissed.

Respectfully submitted this 14th day of May, 2020.

|  |  |
|---|---|
| CHRISTOPHER M. CARR | 112505 |
| Attorney General | |
| | |
| /s/Andrew A. Pinson | |
| ANDREW A. PINSON | 584719 |
| Solicitor General | |
| | |
| BETH BURTON | 027500 |
| Deputy Attorney General | |
| | |
| */s/ Tina M. Piper* | |
| TINA M. PIPER | 142469 |
| Sr. Assistant Attorney General | |

---

Plaintiffs expressly do not challenge the carry-license requirement as applied to those individuals. (*See* Doc. 1, ¶¶ 23, 27, 31, 39, 44, 48).

34

*/s/ Cristina M. Correia*
CRISTINA M. CORREIA                188620
Sr. Assistant Attorney General


*/s/ Meghan R. Davidson*
MEGHAN R. DAVIDSON              445566
Assistant Attorney General

DREW F. WALDBESER
Assistant Solicitor General


40 Capitol Square, S.W.
Atlanta, Georgia  30334-1300
Direct line: (404) 657-3983
Fax: (404) 463-8864
Email: tpiper@law.ga.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendant's Response to Plaintiffs'

Motion for Preliminary Injunction were prepared in 14-point Times New

Roman in compliance with Local Rules 5.1(C) and 7.1(D).

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed **BRIEF IN SUPPORT OF GOVERNOR KEMP AND COLONEL VOWELL'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of the attorneys of record.

This 14th day of May, 2020.

/s/ Cristina M. Correia
CRISTINA M. CORREIA
Senior Assistant Attorney General